Joseph R. Cerny, Administrator, Appellee, v. Harvey Secor et al., Appellants.

No. 40503.

January 13, 1931.

Rehearing Denied March 17, 1931.

*Henry G. Walker, C. C. Putnam* and *Paul H. Williams*, for appellant.

*Frank F. Messer, Don Barnes* and *Donald Barnes, Jr.*, for appellee.

Morling, J.—The action was most thoroughly and meticulously tried by both sides. The evidence is elaborate. Appellants' principal contentions are that the evidence is insufficient to show reckless operation, or that the accident was the proximate result of reckless operation. Defendants contend that the evidence does show affirmatively that there was a defect in de-

fendant's car, and that such defect was the proximate cause of the accident.

The accident occurred shortly before 11 P.M., November 11, 1928, a short distance north of Iowa City, on a paved primary highway. Defendant Secor resides in Iowa City, and had gone  over this highway that same evening to Budrow's Inn, a place of entertainment. Decedent was also at Budrow's Inn. As defendant was about to return to Iowa City, decedent requested, and was given, permission to ride with defendant. The paving from Budrow's Inn to Iowa City is 24 feet in width, constructed with curbs. It runs southeastwardly down grade, and is intersected by other roads. The highway approaches the Iowa River. One creek crosses the highway, and one parallels it. At the place of the accident, the grade is comparatively level. Immediately east of the paving at that place is a steep bank, the toe of which ranges from one foot to 15½ feet from the curb. Defendant was following a taxicab, which was a half block to a block ahead of him, and which contained a number of passengers. Defendant's car was a one-seated roadster, with rumble seat. Three were riding on the seat. Deceased rode alone in the rumble seat. About the time the car reached the beginning of a curve to the right at the place of the accident, and on comparatively level grade, the left wheel passed over the left curb, following the curb some 50 or 60 feet, when the right wheel also went over the curb. About 18 feet from the point where the left wheel crossed the curb, the car collided with and broke down, close to the ground, a 12-inch cedar electric light pole. 25 or 30 feet farther on, it tore out about 21 feet of fence, bending over and tearing loose 2 or 3 iron posts and a brace. Some 50 or 60 feet farther on, it broke down another 10- or 12-inch electric light pole, splintering it from the ground up 3 or 4 feet or more. 38 feet farther on, the car struck a 6-inch box elder, tearing it up by the roots. The light poles were decayed at the ground line, but contained about 9 inches of "fairly good wood." The uprooted tree was in shallow soil. A witness testifies that, the next morning, she said to defendant Secor:

" 'This is terrible; you must have been going at a terrific rate of speed.' He says, 'No,' he says, 'I was going about 45

miles an hour.' I said, 'Well, what in the world happened?' He said, 'Just my brakes locked.' ''

The fire chief, who was called out immediately after the accident, says that he asked defendant ''what happened, and I understood him to say that the brakes locked.'' The coroner, who was at the scene shortly after the accident happened, testifies that he had a conversation with defendant.

''I said, 'What happened?' He said, 'I don't know. I think my wheels locked,' and he said, 'Harve, are you sure your wheels locked?' He said, 'I am sure they did.' I said, 'Can they lock on your car?' He said, 'I wouldn't be positive.' I said, 'How did this thing happen?' He said: 'I don't know whether I put my foot on the brake and it pulled to one side, but anyway, it pulled the car over that way, whatever happened.' He said: 'I think I put my foot on the brake,—I am not sure; but the car swerved to the left, pulled right over to that side of the road.' * * * I think he said at that time he was going about 40 to 45 miles an hour. I think the matter of whether or not he was racing was mentioned, but I think his reply was just that 'I don't think I was,'—I wouldn't be positive. * * * He said to me, 'I don't know, but I think my wheels locked.' I am positive that was his remark. Then I asked him if that could happen, or something to that effect, and he said, 'I am sure it did.' Then after that, something was said about the brakes, and I think this answer was, 'I am not sure whether or not I put on my brakes or not.' He was not positive about the brakes.''

Decedent's mother and another witness testify that, the next day, defendant Secor said: '' 'Well, I want to do all that I can. * * * I am sorry. * * * I know I am guilty.' ''

I. Defendant's theory is that the upper end of the snubber strap became loosened from its attachment and fell or became slack, and the strap and lower buckle became entangled between the snubber strap anchor and the drag link or steering arm, thereby blocking the movement of the steering gear, preventing him from making the right turn necessary to keep on the pavement. Defendant contends that his car, on reaching the end of the curb, was thereby, against his effort to turn to the right, forced along the same line on which it had been traveling, and so forced

off the paving. The fire chief, who examined the tracks of the car the next morning, testifies:

"When it got to the north curb, if it continued in the line that it had, coming across the highway, it would have went up the hill, up the bank. It must have turned to the right."

There is other testimony on this subject. The car was hauled into town soon after the accident. There is testimony that the snubber strap, the next morning, was found disconnected from its upper attachment. The snubber strap is normally held tight, by means of a coil spring hooked in the snubber box. When the spring breaks, or is uncoiled, the snubber strap slackens or falls. Defendant's evidence is that this spring was found to be uncoiled and broken. Defendant introduced evidence to the effect that, in August, he had had trouble in making turns, and on investigation, found that the snubber strap spring was broken. While defendant says that a new spring was inserted in August, his witness says it was inserted on October 21st. Anyhow, defendant admits that the new spring was not used before October 21st. After the difficulty in August, and up to October 21st, the car was used without a snubber strap. On October 21st, a new snubber strap was inserted. Defendant's testimony is that he had had no trouble from October 21st until he attempted to make the right-hand turn, to keep on the paving, at the time of the accident, November 11th, which would be 22 days after the new strap and spring were put in use.

The snubber strap shows that the ends of the steel hooks by which it is anchored at the upper end are broken off and straightened out. The buckle at the lower end of the strap is of steel, has marked abrasions and indentations, and shows much wear from friction. A witness for defendant testifies that the marks could not have been made before the car left the paving, because, until then, the car was going straight ahead, and the snubber strap could not have got tangled in the steering gear. How the new coiled spring could have become broken or uncoiled, how the deep indentations in the snubber strap buckle could have been made by the momentary pressure between the snubber anchor and the steering gear (which is comparatively unresisting), is not disclosed. How the new snubber strap hooks could have become broken and straightened out, and the steel buckle

could have become so abraded, indented, and worn in the few seconds elapsing after the car left the pavement, and before it overturned and stopped, is not explained. Defendant says that the car was equipped with four-wheel hydraulic brakes, besides the emergency brake. The hydraulic equipment was found to be broken. Defendant testifies that, when the snubber strap was giving him trouble in August, he loosened it from its entanglement with the steering gear by jerking at the wheel; that, at the time of the accident, he was unable to turn the car at the curve, and jerked the wheel, as he had done before the repairs were made; that he did not know whether he put on the brakes or not. One of his witnesses, riding with him, testifies that defendant was pulling at the right side of the wheel with both hands, with the evident intention of trying to turn it to the right. There is testimony tending to show that defendant gained on the taxicab ahead of him, the passengers in which say that they were traveling 30 to 40 miles an hour. Defendant's contention is that he was traveling 30 to 40 miles an hour. Defendant testifies that he is an expert driver; that, while the car was listed as capable of running 80 miles an hour, "it would never do that" for him,— "around 75 was the best" he could get out of it; that, with the load at the time of the accident, he had a weight of over two tons. The inference drawn a moment before the accident by one of the witnesses in the taxicab was that defendant was turning to the left, to pass. The right and left curves which the car had traversed just preceding the accident were posted with a police danger sign.

On this record, it was not for the court to say, as matter of law, that the snubber strap hooks were not broken and straightened, or that the coil spring was not straightened, as a result of the bouncing of the car in crossing the curb, in running on the ground, and colliding with the poles, fence, and tree, and overturning. It was not for the court to say that the snubber strap dropped from its attachment or slackened or became entangled with the steering apparatus, and that the accident was thus caused.

Defendant contends that the evidence does not show that he was recklessly operating the car, or that reckless operation was the proximate cause of the accident. Section 5026-b1, Code, 1927, reads:

"The owner or operator of a motor vehicle shall not be liable for any damages to any passenger or person riding in said motor vehicle as a guest or by invitation and not for hire, unless damage is caused as a result of the driver of said motor vehicle being under the influence of intoxicating liquor or because of the reckless operation by him of such motor vehicle."

The court charged that the term is a stronger one than negligent operation or want of reasonable care; that its conduct indicates an indifference to the consequences of action, and constitutes wanton misconduct; that it signifies the driving of an automobile carelessly and heedlessly, in willful or wanton disregard for the rights of others; and that it may import a heedless disregard for obvious consequences; that it does not mean momentary thoughtlessness, inadvertence, or error in judgment. Though this instruction was excepted to, the exception is not here argued.

Whether a particular rate of speed is dangerous depends on surroundings. This paving was evidently much used. It was one where the use of high speed would be manifestly very dangerous both to other users of the highway and to the occupants of the car. The crashing down of the two light poles, the fence, and the tree, was evidence of high speed. Under the circumstances here disclosed, the jury was not bound by the statements of witnesses that the car was traveling 30 to 40 miles per hour. Whether defendant said that his brakes locked, and any inference to be drawn therefrom, were matters for the jury to decide. Whether he said that his wheels or steering gear locked, whether they did lock, whether defendant was racing or driving at a reckless speed around curves and through dangerous surroundings, whether he was recklessly inattentive to the control of his car, were questions for the jury, and not for the court. It was for the jury to say what, if any, admissions the defendant made, and what he meant by them. It was a question for the jury whether the accident was proximately caused by defendant's reckless operation of the car.

II. Decedent, at the time of the accident, was 19 years of age. He had reached the sophomore grade at high school, but, as his mother says, "had to quit because he had grown too fast." Decedent had worked in a store at $10 and $12.50 per week, had

 worked steadily, was very industrious, saved money, bought his own car for $200, kept himself clothed, and helped his parents; he had plans for entering a business college; indoor work did not agree with him, so he went to work at the university; liked outdoor work; was in perfect health, close to six feet in height; he was at home the day of the accident until 6 o'clock in the evening, and said he would be home early, because he had to get up early the next morning. The only evidence concerning his other habits is that, on the evening of the accident, he had some alcohol; that his companion gave him some money for a share; that they "spiked" a bottle of beer at Iowa City, drank it, and "spiked" another at Budrow's. It was stipulated that the expectancy of a person 19 years of age is 42.87 years. The verdict is for $17,000. Defendants urge that the verdict is excessive, and the result of passion and prejudice. Plaintiff was not entitled to recover damages for pain and suffering of the deceased, or for loss of companionship, lacerated feelings, mental pain, or bereavement suffered by his family, or for loss of support. The loss recoverable is the loss to the estate resulting from untimely death.

" 'In short, the measure of the recovery is the reasonable present value of his life to his estate * * *.' " *Droullard v. Rudolph,* 207 Iowa 367.

See, also, *Hammer v. Janowitz,* 131 Iowa, 20, 27.

The court is of the opinion that the amount of the verdict indicates passion and prejudice on the part of the jury, and that the judgment must be reversed, unless the plaintiff shall, within 30 days after the filing of this opinion, file with the clerk of this court a remittitur of all of the verdict and judgment in excess of $7,000, in which case the judgment will be affirmed. If remittitur is not so filed, the judgment will be reversed.—*Affirmed on condition.*

All the justices concur.