EDWIN SKALLA, Appellant, v. MICHAEL DAEGES, Appellant; MATILDA DAEGES, Appellee.

No. 46512.

1262

SEPTEMBER 19, 1944.

G. O. Hurley, of Harlan, and Gordon Diesing, of Omaha, Nebraska, for Edwin Skalla, appellant.

Bennett Cullison, of Harlan, McGinn & McGinn, of Council Bluffs, and Herrick, Sloan & Langdon, of Des Moines, for Michael Daeges, appellant, and Matilda Daeges, appellee.

MANTZ, C. J.—Plaintiff, Edwin Skalla, brought suit against Michael Daeges and Matilda Daeges under what is known as the guest statute (Code section 5037.10). He claims that while riding in a Buick automobile as a guest on the night of April 12, 1942, Michael Daeges, the driver, operated such vehicle in a reckless manner by driving the same into a steel-and-concrete bridge on the highway just east of Portsmouth, Iowa, inflicting dangerous and serious injuries upon him, which injuries were the direct and proximate result of said reckless operation. He claims that the automobile was owned by Matilda Daeges, mother of Michael Daeges, and that the latter was driving the same with her permission and consent.

When plaintiff rested, upon motion of Matilda Daeges the court directed a verdict in her favor, but overruled a like motion to direct a verdict in favor of Michael Daeges. The jury returned a verdict in favor of the plaintiff and against the defendant

Michael Daeges for $13,685. The court required the plaintiff to remit all but $10,000 of said verdict, or submit to a new trial. This was done and the court entered judgment against Michael Daeges for $10,000. Both plaintiff and Michael Daeges appealed, the former on account of the action of the court in directing a verdict in favor of Matilda Daeges and the latter on account of the court's failure to sustain a like motion in his favor and entering judgment against him. Edwin Skalla having first appealed will be referred to herein as the appellant and Michael Daeges will be referred to as the appellee. Matilda Daeges will likewise be referred to as the appellee.

I. In this opinion we will deal with each appeal separately. In so doing there will necessarily be some repetition and restatement, both as to the evidence and authorities cited.

We will first deal with the appeal of Michael Daeges, in which he claims that the court erred in refusing to sustain his motion for a directed verdict, and later in committing various errors in the submission of the case to the jury.

Before taking up the appeals, we think that it will be helpful to a better understanding of the matters involved to set out a summary of the evidence.

Much of the evidence is not in dispute: the ownership of the automobile; its driver; Edwin Skalla, a guest therein; the trip to and from Portsmouth to Harlan and Avoca; the approximate time of the accident; the location of the highway and the bridge; the collision at the bridge; the nature and extent of the injuries suffered by Edwin Skalla.

We think that there is evidence of the following facts and circumstances:

On the night of April 12, 1942, at the hour of about 1:30 a. m., Edwin Skalla, in company with Michael Daeges and another young man, was riding westward in a Buick automobile owned by Matilda Daeges and then driven with her consent by Michael Daeges. The road on which they were traveling was a 20-foot concrete roadbed with 7-foot dirt shoulders on each side. It was a straight pavement and was smooth and dry. About a fourth of a mile east of Portsmouth this road crosses a stream spanned by a 159-foot steel-and-concrete bridge with a driveway 20 feet 4 inches. At the sides of this bridge are curbs and steel

rails, the latter on top of the curb. At each end of the bridge there were red glass reflectors fastened to posts. On the north side and at the east end there was a concrete pillar about 3 feet high and a foot square, weighing nearly 400 pounds. It was fastened at the top and middle by two rails which paralleled the roadbed, and at the bottom was imbedded in concrete with large iron bolts as reinforcements. Along the line of the rails were angle iron steel uprights about 7 feet apart. The steel rails were of angle iron and were 2 x 3 inches and one fourth of an inch thick. The steel uprights were of double angle iron and about the same weight and thickness as the rails. The steel rails were bolted to the uprights. The latter were bolted to the main bridge structure.

Earlier in the evening Michael Daeges, driving the Buick automobile, had come to the Skalla home, north of Portsmouth, and invited Edwin Skalla to go with him on a trip to Harlan and Avoca. Matilda Daeges was not with him. Michael Daeges lived with his mother about two miles east of Portsmouth and in going from their home to Portsmouth they traveled over the road in question. He had driven over this road for a number of years and had crossed the bridge on many occasions. The young folks went to Harlan, later to Avoca, and were on their way home when the accident took place. Michael was driving and was alone in the front seat. While on the trip, before the accident, Edwin Skalla had told Michael that he was driving too fast. The road for at least a quarter of a mile east of the bridge is straight and level. When Michael came to the bridge the car struck the north side, tearing the concrete pillar from its base, hurling it ahead and across the stream into the opposite bank about 110 feet from where it had been fastened. The car straddled the curb and steel rails and came to a stop between 20 and 25 feet west of the east end of the bridge. Both of the steel rails went through the radiator, the dashboard, the front seat, and from there one went on through the rear window, the other through the rear seat and the trunk and projected about 10 feet to the rear of the car. Three of the steel uprights were torn from their fastenings and about 30 feet of the rails were damaged. When the car came to a stop its left wheels were on the paving and the right ones had no support. The front end

was badly wrecked. The foot feed was clear down to the floor. It required the power of a large truck to pull it from the place where it stopped. Many photographs were taken of the highway, the bridge, and the wrecked car, and most of these were in the record.

When the car struck the bridge appellant, Edwin Skalla, was asleep in the back seat. He was knocked unconscious and remained in that condition for six days. He suffered a skull fracture, a rupture of an eardrum, a fracture of a vertebra, and had both bones of his right leg broken. Also he had many cuts and bruises over and about his body. He remained in the hospital for about fifteen days and was then taken by ambulance to his home near Portsmouth. There is little question as to the nature and extent of his injuries. Two physicians stated that in their opinions, based upon examination, some of his injuries are permanent. At the time of the trial he was still suffering from headaches, dizziness, numbness, loss of motion in his leg, an atrophy of its muscles, and injury to its nerves.

Within a few minutes after the collision various people came to the place of the accident. Among these were Harold Haller and Paul Schwery, local residents and friends of Michael Daeges. Both were witnesses. They testified that when they came Michael Daeges was out of the automobile but Edwin Skalla was still in the rear seat. Paul Schwery testified that he asked Michael Daeges how the accident happened and Daeges said that he was speeding down the highway and his car got away from him and he was awake and his lights were on bright at the time he hit the bridge.

Haller testified that he heard Paul Schwery ask Mike if he fell asleep and Mike said ''No,'' that he was wide awake when he hit the bridge; that he had his bright headlights on; that his car was speeding and got away from him at the time he hit the bridge.

There was also evidence that about two weeks after the accident, Michael Daeges, in the presence of five persons, including Schwery and Haller, stated that at the time of the accident he was driving between ninety and one hundred miles per hour at the time he hit the bridge, and that his lights were on bright;

that he was speeding and his car got away from him. All five present testified to such statements.

Witness Lawrence Pauley testified that he talked to Michael Daeges about May 1, 1942, in a café in Portsmouth, and that he asked Mike how the accident happened and Mike said that he was driving from ninety to one hundred miles per hour when he hit the bridge, that his headlights were on and that he was awake when he hit the bridge. Pauley also testified:

"Q. Now, on this particular date, May 1st, 1942, and in the evening in White's Café, did Mike say anything else as to the accident, how it happened? A. Yes. Q. What did he say? A. He said, 'I wish I'd a rammed the damn car clear up to the middle of the bridge,' and then he laughed afterwards. Q. Did you laugh? A. No."

Witness Viola Zangerle testified that at a wedding dance on October 21, 1942, she had a talk with Michael Daeges and he told her he was going ninety to one hundred miles per hour at the time he hit the bridge.

On December 17, 1942, Michael Daeges signed a written statement in which he told how the accident took place. He therein stated that the accident happened about 2 a. m.; that he was going around seventy miles per hour when he hit the bridge and that his lights were on and shone 150 feet ahead; that the pavement was dry and it was a clear night; that he was driving west on Highway No. 39 to Portsmouth; that he first saw the bridge about 50 feet ahead; that the road was clear; that there were bridge reflector signs on the east end; that he saw the bridge and almost immediately struck it; that he did not have time to apply his brakes; that he had driven across the bridge dozens of times; that he was driving the car with the consent of his mother, Matilda Daeges; that she owned it and it was put to family use; that he had invited Edwin Skalla to go with him that night as a guest; that Skalla was asleep at the time, in the back seat; that his eyesight was good at the time of the accident; that he was speeding to get home because it was late when the accident happened; that he lost control of his car speeding.

Michael was a witness in his own behalf. From his cross-examination we quote the following:

"Q. Mike, when you drove that 1940 Buick car, that was in the accident, when you would have the foot feed of the car pressed clear to the floor board on a level stretch of road, how fast did it go, approximately? A. I do not know. Q. Have you ever tried it? A. I ain't saying. Q. What is that? A. I am not saying. Q. You mean that you know and don't want to tell us? A. Maybe. Mr. Cullison: You answer them, Mike. A. Oh, about 150. Q. 150? A. Yes, anyway."

He further said that when he saw the bridge there was not time to put the brakes on. "I hit the bridge before I had a chance to put them on."

Michael, in effect, denied that he made the admissions contained in the statement or those testified to by other witnesses, and claimed that he was going from forty to forty-five miles per hour; when he was about 50 feet from the bridge his headlights went out and he was unable to follow the road and hit the bridge.

II. The question which confronted the trial court when Michael Daeges moved for a directed verdict was whether the evidence then before the court was sufficient to warrant the court in submitting the case to the jury as against said Michael Daeges. Under the familiar rule, the evidence was to be taken in its most favorable light on behalf of Edwin Skalla.

Taking into consideration the physical facts shown to appear —the highway, bridge, automobile, and the damages done to the two last named, coupled with other evidence, including admissions and statements alleged to have been made by Michael Daeges immediately following the accident, and those made later—we are constrained to hold that the issue of recklessness was for the jury and the court did not err in so holding. Under the record made we hold that the situation was one in which reasonable minds could very well reach different conclusions as to that fact; therefore, a submission of that question was not only proper but necessary.

The rule as laid down in Siesseger v. Puth, 213 Iowa 164, 182, 239 N. W. 46, 54, finds proper application here. Let us examine the rule in the light of the facts existing in this case. The holding of the court in that case as to what recklessness consists of was the result of a detailed and exhaustive analysis

of the authorities bearing upon that question. In its essence, the court there held that recklessness was more than negligence, although it might include the latter; that to be reckless one must be more than negligent; that recklessness implies " 'no care, coupled with disregard for consequences' "; that if the conduct be more than negligent it may be "reckless" without being "wilful" or "wanton." The rule there laid down has been followed and approved in many later cases in this jurisdiction. It having become the settled and unquestioned rule in this state, we content ourselves with but a few citations. See Neessen v. Armstrong, 213 Iowa 378, 239 N. W. 56; Shenkle v. Mains, 216 Iowa 1324, 247 N. W. 635; Fleming v. Thornton, 217 Iowa 183, 251 N. W. 158; Stanbery v. Johnson, 218 Iowa 160, 254 N. W. 303; Wright v. What Cheer Clay Prod. Co., 221 Iowa 1292, 267 N. W. 92, and cases therein cited.

We think that the rules laid down by this court in the Siesseger case defining the term "reckless," and later many times approved by this court, have very proper application to the facts of this case as shown by the record, and that the record contains ample evidence to bring that issue within the purview of that holding. There is in the record evidence under which the jury could find that the wreck at the bridge was directly caused by the high, excessive, and uncontrolled speed of the Buick car, during which the driver lost control and crashed into the bridge, causing the injuries to appellant. They could also find that, under the conditions then and there present, the driver was operating the car without heed of or concern for the consequences and in disregard for the safety of the guest. His later statement that he "wished he had rammed the damn car clear up on the middle of the bridge" would certainly indicate a frame of mind willful and wanton and without heed of or concern for consequences. His actions, coupled with his attitude and declarations, required submission of that issue to the jury. Fraser v. Brannigan, 228 Iowa 572, 293 N. W. 50; Cerny v. Secor, 211 Iowa 1232, 234 N. W. 193; White v. Center, 218 Iowa 1027, 254 N. W. 90, and cases there cited.

The appellee Michael Daeges argues at considerable length that the evidence did not justify a submission of the charge of recklessness against him. He has cited many cases, claiming that

they have application. He stresses the fact that the record, taken in the most favorable light to appellant, shows only speed and that speed alone is not sufficient. We recognize that there are statements in various holdings of this court along the line indicated, but quite uniformly those statements have been qualified by saying that speed alone and in and of itself does not constitute recklessness. We have no quarrel with these holdings. As to the facts appearing in this case we think they do not apply. After all, it is an ultimate fact question. Crowell v. Demo, 231 Iowa 228, 1 N. W. 2d 93; Peter v. Thomas, 231 Iowa 985, 2 N. W. 2d 643; Wright v. What Cheer Clay Prod. Co., supra; Mescher v. Brogan, 223 Iowa 573, 272 N. W. 645. In this last-cited case we discuss the mental attitude of the driver. Claussen v. Estate of Johnson, 224 Iowa 990, 278 N. W. 297, is a case where the driver was going at a speed of eighty miles per hour and hit a trailer ahead and then glanced off and collided with a truck, killing all of the occupants. In that case there is an extended discussion of the matter of recklessness, and therein attention is called to several factors: speed; knowledge of the highway; failure to keep a lookout; want of control. This court held that the court did not err in submitting the case to the jury. Many other cases might be cited. The question involved is one of fact. Seldom are two cases similar in that respect. The legal principles are well established. While it is not easy to define the word "reckless" in hard and fast terms, yet, in the concrete, the situation may be readily recognized. We have considered the cases cited by appellee Michael Daeges but are of the opinion that none of them applies to the fact situation present in this case. We hold that the court did not err in submitting to the jury the claim of recklessness as urged by appellant Edwin Skalla.

██ III. Appellee Michael Daeges sets forth in argument various matters in which he claims the court erred. These claimed errors relate to instructions given, others requested and refused, and to the amount of the verdict rendered by the jury.

Before taking up the claims so made relating to the instructions, we call attention to certain matters which we feel are material and have a direct bearing on the issues involved. The

instructions given are somewhat long, but when read carefully, we think set out quite fully the matters necessary to cover.

It is a well-settled rule of this state that instructions are to be taken and construed as a whole. Ruble v. McDonald, 18 Iowa 493; Brown v. Bridges, 31 Iowa 138; Noland v. Kyar, 228 Iowa 1006, 292 N. W. 810; Lathrop v. Knight, 230 Iowa 272, 297 N. W. 291. In this connection, we desire to call attention to the language of Weaver, J., in the case of Law v. Bryant Asphaltic Pav. Co., 175 Iowa 747, 753, 157 N. W. 175, 177, 7 A. L. R. 1189, as follows:

"It is probably true that no instruction or charge to a jury has ever been drawn with such perfect clearness and precision that an ingenious lawyer, in the seclusion and quiet of his office, with a dictionary at his elbow, cannot extract therefrom some legal heresy of more or less startling character. The real test of the meaning and effect of an instruction for the purpose of review by an appellate court ought to be, and we think is, the idea which the language objected to is fairly calculated to convey to the minds of jurors drawn from the ordinary walks of life; and the fact that, upon a minute, technical or hypercritical analysis, some other interpretation can be placed thereon, may be disregarded."

The charge made by appellant against Michael Daeges was based upon recklessness. In his petition he set forth nine specific grounds. These separate grounds were designated "a" to "i," inclusive. Ground "b" alone was submitted; the others were withdrawn by the court. We might say, in passing, that some of the grounds withdrawn under the record herein might properly have been likewise submitted to the jury.

In paragraph 1 of the instructions there is set forth the following:

"(1) That the said defendant at the time of the accident drove said car at a reckless rate of speed, approximately 75 to 90 miles an hour while approaching said bridge * * * in heedless disregard for plaintiff's safety and with indifference to the consequences."

The eight other grounds were not mentioned to the jury.

Also, as a part of said paragraph 1 and preceding the specification above set forth, there was set forth from the petition in considerable detail a recital of the matters which appellant claimed constituted recklessness: the time of the accident; the driver; the position of appellant in the car; the location; road; bridge; speed of operation; the collision with the bridge; and the results of such collision.

Instruction No. 4 sets out the matters which appellant must show by a preponderance or greater weight of the evidence in order to be entitled to recover. Paragraph 2 of said instruction is as follows:

"That the defendant, Michael Daeges, at the time of the accident was reckless in the manner set out in the petition."

Clearly, this referred back to the matters and things set out in Instruction No. 1, wherein is set forth the specific ground submitted.

Instruction No. 6 sets out the law to be applied where the claim of recklessness is urged. The language set forth pertaining to that matter is very similar to the definition given that term in Siesseger v. Puth, supra. The language as set forth has been approved in many subsequent holdings of this court. The jury was told in clear and unmistakable language the limits of the principles to be applied and under what conditions they were to be applied.

Appellee complains of Instruction No. 6 and argues that as set forth it permitted the jury to find the appellee reckless, without guide or direction.

When we take into consideration the issue as set forth, the limitations imposed upon appellant before he would be entitled to recover, and the rules and construction to be used in considering instructions, we are unable to find any merit in the complaint which appellee urges against that instruction.

In addition, said instruction calls attention to the distinction between negligence and recklessness and tells the jury that for appellant to recover he must show more than negligence but that before a recovery for recklessness could be had against Michael Daeges it must be shown that "his acts and conduct

amounted to heedlessness and disregard for consequences and indifference to the rights of others.''

This instruction, when taken in connection with the other instructions, clearly directs the jury as to the application of the law to the facts as shown by the record.

Appellee complains that in the instructions the court failed to confine the jury to a consideration of the specific charge of recklessness submitted. He argues that Instruction No. 1 contains a general allegation of recklessness in addition to a specific charge to that effect. We do not so understand that instruction. A part of that instruction is descriptive as to what happened at and before the accident and some of this is included in the specific allegation of recklessness submitted. We do not think the instructions are open to the objection made. It occurs to us that in some respects the objections made are rather technical.

Appellee claimed that the court erred in failing to give the jury the following instruction:

''You are instructed that the fact, if it be a fact, that the rate of speed at which the defendant was traveling at or just prior to the accident was excessive, would not, in and of itself, in the absence of other circumstances, constitute recklessness on the part of said defendant.''

We do not think the court erred in refusing to give the proposed instruction under the record in this case. That speed alone ordinarily does not constitute recklessness may be conceded. But there was evidence in this case showing that appellee was driving at a rate of from eighty to ninety miles per hour and got off the highway and crashed into the bridge. McKlveen v. Townley, 230 Iowa 688, 299 N. W. 25; Mescher v. Brogan, supra, 223 Iowa 573, 272 N. W. 645.

While the appellant claimed in his specification of recklessness that the appellee was driving seventy-five to ninety miles per hour, the record has evidence of statements by appellee that he was going between ninety and one hundred miles per hour. He testified that the car on a level highway would go about one hundred fifty "anyway." In the light of this evidence there was no error in refusing to give the proposed instruction.

█ Appellee complains that the court erred in giving Instruction No. 7 in that, among other things, it failed to set out his theory of defense. The record shows that his defense in the main was that he was going down the highway and was approaching the bridge and his lights went out when he was within 40 to 50 feet from it and by reason of the failure of such lights he ran into the bridge. The specific complaint is that the court did not set forth the speed at which appellee claimed he was proceeding, to wit, forty to fifty miles per hour. We do not think that the court was required to set forth in detail all of the items of defense claimed by appellee. In that same instruction the court did instruct the jury that if they found that the lights of appellee's car went out as claimed by him, and that such was the sole proximate cause of the injury to appellant, then appellant could not recover. It seems to us that the claim of the appellee that the jury could have believed all his evidence as to his speed and lights going out and still find for the appellant is somewhat farfetched.

█ A part of Instruction No. 7 deals with the matter of recklessness shown and concurring with the failure of the lights of appellee. In effect, the court told the jury that it must appear that the appellee was reckless in the manner claimed by appellant, and that if in so doing his lights went out and these two matters concurred and combined to cause the collision, this would not relieve appellee from liability, if his wrong, concurring with the other cause was the proximate cause of the injury. We do not believe the court erred in so instructing the jury. Johnson v. McVicker, 216 Iowa 654, 247 N. W. 488. and cases there cited; Gould v. Schermer, 101 Iowa 582, 70 N. W. 697.

█ Appellee complains of the refusal to give requested Instruction No. 4 on the subject of photographs. We will not set out the requested instruction. It seems to be based upon the theory that the photographs introduced showed conflicts in views and did not correctly set forth the matters appearing therein. The photographs are before us for examination. They were before the jury. There was no claim that they did not correctly represent the objects appearing thereon. Most of them show various views of the highway and the bridge. There were some showing the appearance of the car after the collision. None

of them appears to us to have conflicting views or appearances of the same object. Aside from the photographs there was abundant evidence dealing with the matters shown therein and attesting to their correctness and accuracy. There were twenty-one photographs introduced by appellant. Fifteen of these were later reintroduced by appellee. There was no question as to their identification or accuracy. No objections were made except to a few which were duplicates. Under this record we do not think the court erred in refusing to give the requested instruction.

It is the claim of appellee that the court erred in submitting to the jury the different items of damage as claimed by appellant. In his petition appellant set out and specified the nature and extent of his injuries and he demanded judgment therefor against appellees. In his petition he claimed six separate items of damage. Five of these were submitted to the jury by the court. The ones submitted were substantially as pleaded. They were as follows:

| | |
|---|---:|
| Medical expenses, etc. | $ 685 |
| Fractured skull, broken bones, permanent injuries, etc. | 15,000 |
| Past pain and suffering | 5,000 |
| Future pain and suffering | 4,000 |
| Past, future, and permanently injured earning capacity | 10,000 |
| Total damages claimed | $34,685 |

The specific complaint which appellee makes is that the instruction permitted the jury to return double damages. Here the court set out in separate items the specific claims for damages in each one. This would enable the jury to take up and consider each separately. It can hardly be questioned that appellant could recover for damages in each of the items submitted. We would hardly be warranted in assuming that the jury would deliberately assess damages twice for the same item. Appellee, in support of his claim that the instructions allowed the jury to return double damages, cites the case of Gehlbach v. McCann, 216 Iowa 296, 249 N. W. 144. The petition in that case was based upon two counts and the verdict allowed on both counts. The court called attention to the fact that certain items were set out in

both counts and that there it was obvious that recovery was had for the same items on both counts, something not permissible. Consequently, the language of the court therein has no application here. This court in a number of cases has passed upon a like situation—that is, a claim that under certain instructions in personal-injury cases double damages were allowed. In Rhodes v. Des Moines, I. F. & N. Ry. Co., 139 Iowa 327, 331, 115 N. W. 503, 504, this court had before it a claim similar to that which appellee is making herein as to the matter of double damages. There a brakeman had lost his arm. The instruction told the jury that if plaintiff was entitled to recover he was entitled to compensation for physical and mental pain and suffering, compensation for loss of his arm, and compensation for decreased earning capacity in the future. It was there claimed that a verdict which would fairly compensate the plaintiff for the loss of his arm must necessarily include mental and physical pain and suffering and loss of earning capacity. In disposing of this matter adversely to the claim of defendant, the court used the following language:

"It is undoubtedly true as an abstract proposition that the loss of an arm would include the other two elements of damage, and in fact, broadly speaking, it would include all damage whatsoever. The question here presented, however, is whether the jury was misled by the instruction, and awarded double damages because of the reference to the other elements, or because of the direction to compensate the plaintiff for the loss of his arm in connection with the other elements named. The jury would surely understand that it was to compensate for pain and suffering and for loss of earning capacity, because it was specifically so instructed. It would also understand from common observation and knowledge that the loss of an arm may occasion great personal inconvenience and damage, not included in the loss of earning capacity. Moreover, all jurors understand that double compensation is not allowed in these cases, and we think the assumption that they acted differently in this case would be unwarranted by anything in the record before us. We conclude, therefore, that the instruction was not prejudicial."

1276

See, also, Coon v. Rieke, 232 Iowa 859, 6 N. W. 2d 309; Bachelder v. Woodside, 233 Iowa 967, 9 N. W. 2d 464.

The last error which appellee urges is that the verdict of the jury of $13,685 was grossly excessive, and that following the remittitur to the amount of $10,000 it was still grossly excessive, and he argues that such an excessive verdict would indicate passion and prejudice on the part of the jury.

Assuming that appellant is entitled to recover, the amount thereof becomes a question of fact for the jury, and courts are and should be slow to interfere where there is substantial evidence in the record to support their finding.

Appellee does not question the fact that appellant suffered serious injuries; neither does he claim that permanent injuries have not followed the accident. The only evidence by medical men was offered by appellant. One of these physicians treated appellant from the start and gave testimony based upon treatment for a period of about a year. The other physician, of eminent qualifications, based his opinion upon an examination made of appellant about a year following his injury. Both of these witnesses gave opinions to the effect that appellant had suffered injuries which were permanent. The testimony of these witnesses was to the effect that appellant had suffered a permanent injury to his brain; also like injuries to his right leg, which had become shorter and the atrophy of the muscles was causing it to become smaller, due to permanent nerve injury; that there was permanent injury to his hearing, and that because of the brain injury appellant was liable to continue to have severe head pains and headaches; that he would not be able to do normal labor where stooping or lifting was required. After the injury appellant was unconscious for a period of six days, indicative of a fracture of the skull and brain injury. Dr. McGowan, the attending physician testified:

"I would say the patient was near death for about four or five days."

Appellant was a farmer, twenty-two years old, and had a life expectancy of forty years. After his injury he was taken to the hospital and remained there a little over two weeks, being taken to his home in an ambulance. He suffered from headaches

and pains constantly. He had a cast on his leg for about three months. This removed, he went about on crutches, and followed with a cane, and it was six months before he could walk without support.

We have gone over the record and have arrived at the conclusion that the reduced verdict is not excessive, and further, that the verdict rendered did not indicate passion or prejudice. Engle v. Ungles, 223 Iowa 780, 273 N. W. 879; Henriksen v. Crandic Stages, 216 Iowa 643, 246 N. W. 913.

Other points are argued by appellee but we do not think there is sufficient merit therein to warrant our reversing the case on the appeal of Michael Daeges.

IV. We will next consider the appeal of Edwin Skalla from the ruling of the court wherein his claim against Matilda Daeges was dismissed. When appellant rested, Matilda Daeges moved for a directed verdict principally upon the ground that the evidence on behalf of appellant failed to establish the liability for recklessness as applied to her. This motion was sustained generally, provoking this appeal.

In this appeal Edwin Skalla claims that the court erred in dismissing the claim against Matilda Daeges in three particulars: (1) In sustaining objections to the evidence of Paul Schwery and Harold Haller as to res gestae statements made by the appellee Michael Daeges at the time of the accident. (2) In finding that there was no competent evidence upon which the jury could have found that the car was operated in a reckless manner within the meaning of the guest statute as to Matilda Daeges. (3) In finding that there was no competent evidence from which a jury could have found that Edwin Skalla was riding in the motor vehicle at the time of the accident as a guest of Matilda Daeges. Ground 3 will not be considered, as Matilda Daeges concedes that Edwin Skalla was a guest at the time of the accident. Further, the court instructed as a matter of law that he was a guest at that time.

V. The ultimate question to be passed upon in this appeal is whether Matilda Daeges, owner of the car, was liable in damages to Edwin Skalla for injuries received by said Edwin Skalla and caused by the reckless operation of the car by its driver, Michael Daeges. While various grounds were set forth in the

motion of Matilda Daeges to direct a verdict, they all sum up, in effect, to the above question.

The facts and circumstances out of which this accident arose have been quite fully set forth in the appeal of Michael Daeges and we think it unnecessary to repeat them herein, save and except when necessary in the discussion of this appeal.

The first matter to be considered is the claim of Edwin Skalla that the court erred in excluding the evidence of Paul Schwery and Harold Haller as to certain statements claimed to have been made by Michael Daeges just after the accident. The court admitted these alleged statements as against Michael Daeges but excluded them as to Matilda Daeges. Edwin Skalla claims that such statements were admissible against both Michael Daeges and Matilda Daeges, as being part of the res gestae.

In order to give consideration to this claim of Edwin Skalla we will go to the record to find under what conditions such statements were claimed to have been made. There is no dispute in the record as to the nature of the statements claimed to have been made by Michael Daeges. The appellee makes the claim that during the trial evidence of such statements of Michael Daeges was offered as to both appellees; that the court sustained objections on behalf of Matilda Daeges and that thereafter the questions and objections thereto were withdrawn so far as applying to Matilda Daeges. The record is somewhat confused upon that matter and what actually took place is a matter of sharp dispute between Edwin Skalla and Matilda Daeges. Paul Schwery and Harold Haller came to the scene of the wreck a few minutes after it happened. Both testified the wreck took place about 2 to 2:15 a. m., April 12th. They found Michael Daeges standing beside the car; the injured Edwin Skalla was still in the car. When they arrived Paul Schwery asked Michael Daeges how the accident happened. He testified that Michael answered that he was speeding down the highway and his car got away from him; that he was awake at the time he hit the bridge and that his lights were on bright at that time. This evidence is fully corroborated by the witness Harold Haller, who stated that he heard Paul Schwery ask the question and heard the answers given by Michael Daeges.

There seems to be considerable dispute and confusion in

the record as to that part of the examination of the witnesses Schwery and Haller as applied to Matilda Daeges. When Paul Schwery was examined as to this conversation objection was made on behalf of Matilda Daeges that the same was in no way binding upon her. Then the court ruled:

"It will not be received except as against Michael Daeges. All parties adversely affected are given an exception. Mr. Langdon: May it be conceded. Mr. Diesing: We offer this as to the defendant Michael Daeges, but not the defendant Mary Matilda Daeges. The Court: This testimony offered is offered as against Michael Daeges and is not to be considered by the jury as to the defendant Mary Matilda Daeges, and the jury shall not give it any weight whatever as against Mary Matilda Daeges. All parties adversely affected by the ruling of the court are given an exception."

Following this Schwery testified to the statements which he claimed Michael Daeges made a few minutes after the accident in response to Schwery's inquiry as to how the accident happened.

From this record it will be seen, when the offer was made as to the statements of Michael Daeges as to how the accident happened, the court sustained the objection on behalf of Matilda Daeges and then Edwin Skalla offered it as against Michael Daeges.

The record made at the time Harold Haller was interrogated about the statements alleged to have been made by Michael Daeges at the bridge is more involved. It shows that when Haller was asked if he heard Paul Schwery ask anything of Michael Daeges objection was made on behalf of Matilda Daeges that same was hearsay and in no manner binding upon her and wholly inadmissible as against her:

"Mr. Diesing: We offer it only as to the defendant Michael Daeges. The Court: The objection to this evidence of any conversation with Michael Daeges, anything he said or did there is sustained as to Matilda Daeges, and the jury in considering this case as against Matilda Daeges are instructed that they should give no weight to this testimony as against her, not to consider

it in any way, and that ruling will prevail throughout any of these conversations between Michael Daeges and any of these witnesses or any conversations they overheard or statements made by Michael Daeges where Matilda Daeges was not present, and the same instructions will prevail throughout. All parties adversely affected are given an exception. Mr. Langdon: Do I understand that the objection may stand without repetition? The Court: The same objection will stand as to each question, as to any statements or actions of this Michael Daeges, and the same instructions to the jury. It is incompetent as against Matilda Daeges. All parties adversely affected are given an exception. Mr. Diesing: The plaintiff withdraws the offer made to that particular question, now, and offers the following question. The Court: I think I said, in any of his doings. All parties adversely affected are given an exception. Mr. Langdon: He withdraws the question. Mr. Diesing: I withdraw *that* question. Q. Now, Mr. Haller, in the presence of Mike Daeges at the bridge after the accident did you hear Paul Schwery ask Mike Daeges anything there at the bridge? Mr. Langdon: On behalf of the defendant Matilda Daeges that is objected to as in no manner binding on her, it is hearsay, incompetent, irrelevant and immaterial insofar as she is concerned. We would like to have the objection stand as to this entire line of testimony in connection with this witness, and the ruling of the court stand, whatever it is. Mr. Diesing: That is understood by all of us, that it stands. The Court: Sustained as to Matilda Daeges and overruled as to Michael Daeges, and that is made a part of the ruling to each question relating to conversations with the witness, overheard, or that he had with Michael Daeges, and the jury are instructed not to give any weight to this testimony as against Matilda Daeges, and that instruction prevails through this evidence in respect to conversations with Michael Daeges. Mr. Diesing: Read the question. The Reporter: Now, Mr. Haller, in the presence of Mike Daeges at the bridge after the accident did you hear Paul Schwery ask Mike Daeges anything there at the bridge? Q. 'yes' or 'no.' A. Yes. Q. Tell the jury what you heard Paul Schwery ask Mike Daeges and what Mike Daeges said there, if anything at the time? A. He asked Mike if he fell asleep. Q. And what did Mike say? A. He said 'no,' he was

wide awake at the time he hit the bridge. Q. Was anything else said by Mike? A. He said he had his bright headlights on. Q. Anything else said by Mike? A. He said he was speeding and his car got away from him at the time he hit the bridge."

From this record it appears that the testimony of Schwery as to the statements made at the bridge by Michael Daeges was objected to by Matilda Daeges and the objection was sustained and thereupon the attorney for Edwin Skalla offered it as against Michael Daeges. The situation as to Haller is somewhat different. When that witness was asked as to the conversation between Schwery and Michael Daeges the objection was that it was hearsay, not binding on Matilda Daeges, and wholly inadmissible as to her. This the court sustained. We call particular attention to the record at this point, that is, following the sustaining of the objection:

"Mr. Diesing: The plaintiff withdraws the offer made to *that particular question,* now, and offers the following question. The Court: I think I said, in any of his doings. All parties adversely affected are given an exception. Mr. Langdon: He withdraws the question. Mr. Diesing: I withdraw *that* question."

The question withdrawn was:

"Did you hear Paul Schwery ask Michael Daeges anything?"

The question asked in the place of the one withdrawn was:

"Now, Mr. Haller, in the presence of Mike Daeges, at the bridge after the accident did you hear Paul Schwery ask Mike Daeges anything there on the bridge?"

As above set forth, the only objection urged by Matilda Daeges against the offered evidence of Haller was that it was "in no manner binding on her, it is hearsay, incompetent, irrelevant, and immaterial insofar as she is concerned."

Just how much time elapsed between the time of the wreck and the claimed statements made by Michael Daeges in answer

1282

to the question cannot be definitely said. However, it could not have been more than a few minutes after the crash. Michael Daeges was out of the car and showed evidence of considerable excitement. The other occupants were still in the car. A crowd gathered at once and the situation would naturally suggest the inquiry as to how the accident happened.

Were the statements claimed to have been made at that time by Michael Daeges a part of the res gestae? To so designate them by that name in question or offer would not be necessary. If the offered evidence came within the rule it should have been admitted.

In the case of Duncan v. Rhomberg, 212 Iowa 389, 394, 236 N. W. 638, 642, that question arose. In that case the driver (son of the owner), immediately following a collision in which plaintiff, a guest, was injured, was alleged to have made a statement in effect that, "I know I was driving [too] fast." Objection was made by the defendants but the court held that the statement was admissible not only against the driver but the owner of the car. The owner was not present. This court held that such evidence was a part of the res gestae and was properly admitted. At the time the statement was claimed to have been made the injured plaintiff had not been removed from the car. The witness who testified to the statement of the driver came upon the scene after the wreck and was rendering assistance to the injured person and while so doing heard the driver make the statement, "I know I was driving [too] fast." In the Duncan case, supra, Wagner, J., made an analysis of some of our cases dealing with the subject, calling attention to various cases in our court wherein it was held that the admissions of the driver were not admissible against the owner, mentioning the cases of Cooley v. Killingsworth, 209 Iowa 646, 228 N. W. 880; Wilkinson v. Queal Lumber Co., 208 Iowa 933, 226 N. W. 43; Looney v. Parker, 210 Iowa 85, 230 N. W. 570; Wieneke v. Steinke, 211 Iowa 477, 233 N. W. 535. However, where the declarations are part of the res gestae they are admissible against the owner and are considered substantive evidence of the matters stated. Alsever v. Minneapolis & St. L. Ry. Co., 115 Iowa 338, 88 N. W. 841, 56 L. R. A. 748; Keyes v. City of Cedar Falls, 107 Iowa 509, 78 N. W. 227; Sutcliffe v. Iowa State Traveling Men's Assn., 119 Iowa 220, 93

N. W. 90, 97 Am. St. Rep. 298; Lynch v. Egypt Coal Co., 190 Iowa 1272, 181 N. W. 385; State v. Minella, 177 Iowa 283, 158 N. W. 645; Bettinger v. Loring, 168 Iowa 103, 150 N. W. 31; Roushar v. Dixon, 231 Iowa 993, 2 N. W. 2d 660.

In Keyes v. City of Cedar Falls, supra, 107 Iowa 509, 517, 78 N. W. 227, 230, we said:

"It is often difficult to determine when a statement or declaration is a part of the res gestae. The rule we have heretofore announced is that, if they are near enough in point of time with the principal transaction to clearly appear to be spontaneous and unpremeditated, and free from sinister motives, and afford a reliable explanation of the principal transaction, they are admissible in evidence."

Speaking of the time element, we said, in Smith v. Dawley, 92 Iowa 312, 314, 60 N. W. 625:

"The declarations, to be admissible in evidence, need not be precisely concurrent in point of time with the principal transaction. If they are so near to it as to afford reliable information as to the truth of the transaction, it is sufficient."

In the present case a part of the declaration of Michael Daeges was that he was speeding and his car got away from him at the time he hit the bridge. This statement was made within a few minutes after the car struck the bridge; the injured Edwin Skalla was still in the car. Michael was on the ground acting "awfully excited" and saying to a person who drove up, "My God, Joe, we had a wreck." His declaration that he was speeding and his car got away from him and hit the bridge goes beyond a mere narration, and it seems to us that it was a spontaneous explanation of the act and transaction. Without going into a more extended review of the authorities upon the question, we are constrained to hold that such declarations were of such a nature that they were admissible against both Michael Daeges and Matilda Daeges and that the court erred in excluding them against Matilda.

VI. The second error which Edwin Skalla claims the court committed was in directing a verdict in favor of Matilda Daeges, wherein the court ruled that there was no evidence from

which a-jury could find recklessness as against that appellee. We hold that the court erred in so directing a verdict. We hold that the evidence in the record is such that it became a jury question as to whether Michael Daeges operated the car recklessly at the time Edwin Skalla was injured. The court held that as against Michael Daeges on that issue there was a jury question.

Prior to the enactment of chapter 119 by the Forty-second General Assembly, section 5026 [Code, 1924] was as follows:

"In all cases where damage is done by any car driven by any person under fifteen years of age and in all cases where damage is done by the car, driven by consent of the owner, by reason of the negligence of the driver, the owner of the car shall be liable for such damage."

This action was brought under what is known as the "guest statute," section 5037.10, Code of 1939 (formerly section 5026-b1), which is as follows:

"The owner or operator of a motor vehicle shall not be liable for any damages to any passenger or person riding in said motor vehicle as a guest or by invitation and not for hire unless damage is caused as a result of the driver of said motor vehicle being under the influence of intoxicating liquor or because of the reckless operation by him of such motor vehicle."

In the case of White v. Center, supra, 218 Iowa 1027, 1029, 1036, 254 N. W. 90, 91, 94, the court had before it the question of the liability of the owner of a car where the damage was by reason of the reckless operation of the car by the driver. There suit was brought against the driver and the owner, claiming that the damage was by reason of the reckless operation of the car by the driver. In that case the guest was injured by the act of the driver in running into a load of corn on the highway. At the conclusion of plaintiff's evidence, upon motion of both defendants the court directed a verdict in their favor. Upon appeal the action of the lower court was reversed, this court holding that the evidence made a jury question as to both defendants. One of the grounds of the motion for a directed verdict was as follows:

"* * * third, that the liability of an owner for the acts of one driving his car with his consent is purely statutory, and

there is no statute which imposes upon the owner liability for damages resulting from the reckless acts of one driving the car with the owner's consent.''

In discussing the claim of defendant owner that he was not liable under the guest statute for the reckless operation of the driver, this court, in that case, remarked that this was the first time that precise proposition had been directly presented to the court. We quote from the language of the opinion on that matter:

''An examination of section 5026-b1 readily discloses that the only effect of the amendment contained in this section upon the original provisions of section 5026 consists in relieving the owner or operator of liability to a guest or passenger not for hire, except in two cases: First, where the damage is caused as the result of the driver of said motor vehicle being under the influence of intoxicating liquor; and, second, where the damage is caused because of the reckless operation by the driver of such motor vehicle. Here, we are not concerned with the intoxication of the driver, but only with his reckless operation of the motor vehicle. It will be noted that the amendment contained in section 5026-b1 refers to 'the owner or operator'. If it had been the intention of the legislature to relieve the owner of all liability for reckless operation of a car by another person, it could easily have expressed this intention. By providing that the *owner* or operator shall not be liable except in the two cases, to wit, where the driver is intoxicated, or where he is guilty of the reckless operation of the automobile, it would seem to be the intention of the legislature that the *owner* as well as the operator shall be liable in these two cases. Moreover, it does not follow that, because the driver of an automobile is guilty of recklessness, he is not guilty of negligence.''

See Harvey v. Clark, 232 Iowa 729, 6 N. W. 2d 144, 143 A. L. R. 1141, and cases there cited.

The statute as amended is clear and plain in its language. When the legislature used the word ''owner'' in the amendment it cannot be presumed or inferred that it was not familiar with the statute it was amending. It might well have had in mind the holding of the owner to account when he permits an-

other to operate his automobile and in so doing injures others by reckless operation. We are unable to see wherein the holding of an owner liable for the results of his reckless operation of a car works any hardship on such owner. The present case presents a rather striking example of what can and does happen when the owner of a car permits others to drive apparently without supervision or restraint.

We hold that the court erred in directing a verdict in favor of the owner, Matilda Daeges.

Affirmed on the appeal of Michael Daeges; reversed on the cross-appeal of Edwin Skalla.—Affirmed in part; reversed in part.

All JUSTICES concur.