246 F.2d 123
 Florence A. SPRINGER, as Administratrix of the Estate of Ralph B. Springer, also known as R. B. Springer, Deceased, Appellant,
v.
CITIZENS CASUALTY COMPANY OF NEW YORK, Appellee.
 No. 16456.
 United States Court of Appeals Fifth Circuit.
 July 19, 1957.
 Rehearing Denied August 16, 1957.
 
 T. D. Ellis, Jr., Sherwood Spencer and Ellis, Spencer & Butler, Hollywood, Fla., for appellant.
 Herschel E. Smith, Miami, Fla., Knight, Smith, Underwood & Peters, Miami, Fla., of counsel, for appellee.
 Before HUTCHESON, Chief Judge, and TUTTLE and CAMERON, Circuit Judges.
 CAMERON, Circuit Judge.
 
 
 1
 This appeal presents the question whether plaintiff's evidence raised issues for jury decision[1] in an action by the insured to recover from the insurer an amount the insured was compelled to pay as the result of a personal injury suit, the insured's action being predicated on the alleged bad faith of the insurer in failing to settle with the injured person within policy limits. The insured[2] (plaintiff-appellant) was compelled to pay the sum of $75,074.80 as excess over and above the $5,000 limit contained in an Automobile Liability Insurance Policy issued by insurer, Citizens Casualty Company (defendant-appellee), in liquidation of a judgment rendered against her and others in a Florida State Court based upon personal injuries inflicted by one Knowles while he was driving an automobile rented from the insured and covered by the policy.
 
 
 2
 Said Knowles drove said automobile against Pearl Morrell Morris, inflicting serious and permanent injuries; the insurer was promptly notified and assumed control of the claim she made against the insured pursuant to the provisions of the policy; and it refused to settle her claim on at least three occasions when it had opportunity to do so within the policy limits. Insurer defended this action brought against it by insured[3], answering in general terms that it was not guilty of any bad faith in the handling of settlement negotiations with Mrs. Morris and her attorney. It developed, from a colloquy between court and counsel near the beginning of the trial in the court below, that the insurer's main defense was that Mrs. Morris was guilty of contributory negligence barring her from recovery in her suit against the insured and others.[4]
 
 
 3
 After the insured had put on her evidence, consisting chiefly of proof of repeated efforts on her part to induce insurer to settle within the policy limits of $5,000[5], and of the details of settlement negotiations between the several parties, and proof of the rendition by the jury in Mrs. Morris' suit against the insured and others of a verdict for $75,000 whose judgment had been affirmed by the Florida Supreme Court, the court below granted insurer's motion for a directed verdict chiefly on the ground that all of the attorneys in the case felt that the case was one of doubtful liability.[6]
 
 
 4
 The two witnesses upon whose testimony the court's ruling was based were the attorney for Mrs. Morris in her suit against insured and one of the attorneys who acted for insured along with the other defendants in that suit.[7] Assuming that such "expert" testimony was admissible, we are unable to agree with the court's conclusion that absence of bad faith on the part of the insurer was by it established as a matter of law.
 
 
 5
 Our disagreement is based upon several grounds: (1) one of insured's attorneys in the Morris suit who testified stated positively that he was of the opinion that insurer's liability was quite clear in the light of admissions found in the insurer's file; (2) the record before the court below contained no proof from which contributory negligence could be attributed to Mrs. Morris; and (3) the evidence introduced by the insured in the court below was ample to contradict the opinion evidence of the two attorneys, or at least to establish facts from which reasonable men could find that the insurer was guilty of bad faith. This opinion will relate chiefly to ground three.
 
 
 6
 While the court below was not bound by what transpired in Mrs. Morris' suit, it could not ignore the facts, in evidence before it without objection, that a dispassionate Florida trial court and jury had decided that Knowles had negligently injured Mrs. Morris, that she was not contributorily negligent (or was protected under the doctrine of last clear chance) and had placed a valuation of $75,000 on her injuries; and that the Supreme Court of Florida had[8] affirmed the decision, holding that the evidence of negligence and contributory negligence was "in direct and hopeless conflict" and that the verdict and judgment would also be approved under the last clear chance rule.[9]
 
 
 7
 It being insurer's duty to make a reasonably prompt and thorough investigation of the facts and there being no proof that any facts upon which the courts of Florida acted were not known by insurer,[10] a question is raised at the outset whether the insurer did not have knowledge of facts which its expert claim handlers ought reasonably to appraise as sufficient to require the conclusion that Mrs. Morris' case against insured would be submitted to a jury. The record showing abundantly and all parties before us conceding that the injuries were sufficient to support a very large verdict, that question encompasses also the good faith of the company in its stubborn refusal to offer even one-twentieth of the jury award and to settle so dangerous a case by the payment of the entire obligation contained in its insurance contract.[11]
 
 
 8
 A brief examination of the opportunities insurer had of settling insured's liability within the policy limits will demonstrate that the jury was warranted in finding bad faith on its part, keeping in mind that the insurance contract between them laid upon insurer the duty of being at least as zealous in protecting insured's interests as it was in looking after its own. For two months following Mrs. Morris' injury she had no lawyer and, through her sister, made contact with insurer's representatives. Being without funds to meet the enormous expenses which were rapidly accumulating, Mrs. Morris was interested chiefly in obtaining money sufficient to cover hospital and doctors' bills, which at that time aggregated about $4,300, and she was willing to give a full release for that amount. The best commitment she was then able to get from the insurer's representative was that maybe the company would pay $3,000 which he would try to get the Springers to supplement to the extent of $500. The trial court doubted the admissibility of such evidence without definite proof that it was communicated to the company. The evidence was clearly admissible in view of the testimony of Mrs. Morris and her sister and of the duty of the insurer to keep in continuing contact with the injured lady in an effort to bring about a settlement.
 
 
 9
 About two months after Mrs. Morris' injury insurer's local representative established contact with an attorney who was then acting for her without pay, and the attorney was offered $3,500 which was the limit which had been placed on the claim. In a letter to insurer's home office the local representative expressed the opinion that this limit would eventually settle the case and stated further: "During the course of one of our conferences * * *, this attorney was trying his best to get us to boost our figure another $500.00 * * * We have exhausted any possibility of securing any contribution from the insured (Springer) until our limits have been exhausted. The claimant's attorney has also made overtures to Springer for a contribution." [Emphasis supplied.] From that it is clear that insurer could then have settled the claim for $4,000. It is further manifest — a fact which subsequent dealings served to emphasize — that the insurer was immovably bent upon requiring the insured to make a contribution towards settlement before offering the full amount of its liability under the policy. The above letter was written May 15th, and it appears that the insurer dropped its efforts to settle until the latter part of September after suit had been filed by Mrs. Morris — a circumstance the jury was entitled to consider in determining whether the insurer had fulfilled its good-faith obligation in the handling of the claim.
 
 
 10
 During the weeks after the filing of suit and before it came to trial in April, 1951, insured, through her attorney, kept pressing, orally and in writing, the insurer to settle the suit against her within the limit of $5,000, which the attorney assured the company could be done. Something like a week before the date set for trial Mrs. Morris' attorney wrote insured's attorney that $5,000 would be accepted in settlement of the claim as against her.[12] Insured's attorney, receiving a copy of that letter, wrote insurer's attorney demanding that the offer be accepted.[13] The attorney for the insurer replied that under established legal principles, he did not feel that the company was bound to pay the $5,000, especially in view of the fact that the company had a responsibility to protect Knowles also.[14]
 
 
 11
 The words emphasized in this letter are important because the record contains no hint that Knowles had ever called upon the insurer to defend him in the Morris suit or had expected any such assistance from it. The evidence, on the other hand, makes it clear that Knowles had protection with another insurance company and that he was represented in the Morris suit by an attorney employed by the other company.
 
 
 12
 Moreover, any liability the insurer might have had with respect to Knowles grew solely out of the omnibus clause of its policy with insured, while its obligation to defend insured was imposed by explicit language in the insurance contract itself. The insurer could in no event be called upon to pay more than $5,000 in discharge of its entire liability under the policy.[15] The jury would have been justified in doubting the good faith of insurer's solicitude for Knowles under the terms of the policy and the facts in evidence.
 
 
 13
 Moreover, it was revealed by a letter written from the field representative to the home office of the insurer a short time before the trial and brought to light by an order of court obtained by insured, that the company was in possession of information which greatly discounted its persistent reliance upon its asserted ability to keep the Morris case from going to the jury.[16] In the light of this report, and in the absence of any showing that the insurer had obtained a statement from Mrs. Morris giving her version of how the accident happened, it is apparent that the jury would have been justified in finding that the insurer's insistence that the case could be successfully defended without submission to the jury was not in good faith.
 
 
 14
 It appeared further the information contained in the report last quoted was never imparted to the insured until long after the verdict had been rendered in the Morris case and then it acted only under the compulsion of a court order. Under the circumstances reflected in this record, it was the insurer's duty to keep insured reasonably informed of the facts as disclosed by its investigation.[17] These facts would have been considered by the jury against the background of the comparative risks to which the insurer and the insured would be subjected by refusal to settle.[18] The insurer stood the chance of losing by its bold gamble only $5,000 while the insured was subjected to a risk ten or more times that figure.
 
 
 15
 Under well established principles of law, all of the factors described above were entitled to consideration by the jury. One of the leading cases announcing these principles is the decision of this Court in American Mutual Liability Insurance Co. of Boston, Mass. v. Cooper, 5 Cir., 1932, 61 F.2d 446. There we affirmed a judgment upon jury verdict in a case where the language of the policy was substantially the same as that now before us, and we held that it was a question for jury decision whether the insurer had not acted too much for its own protection and with too little regard for the rights of the insured in refusing to settle within the policy limits.[19]
 
 
 16
 We recognized and applied the same principles in Home Indemnity Co. v. Williamson, 5 Cir., 1950, 183 F.2d 572. The whole subject is well developed in a note in 40 A.L.R.2d p. 168, et seq., and pp. 181, 205, 220 and 225. And see also American Federal Casualty Co. v. Greyhound, 5 Cir., 1956, 232 F.2d 89; and 29 Am.Jur., Insurance, § 1079, p. 809, and 1956 Cumulative Supplement, p. 145.
 
 
 17
 Appellee relies heavily upon our recent decision in Hall v. Preferred Accident Ins. Co. of New York, 1953, 204 F.2d 844, 40 A.L.R.2d 162. We do not consider it authority here for several reasons, including these: (1) we there affirmed the finding of facts of the court below sitting without a jury; (2) an important finding was that the insured had deceived the insurer and failed to cooperate with it; and (3) one of the chief points in the case was whether or not the driver of the car was an independent contractor and the decision of that point was based upon Georgia law upon which the decision was based.
 
 
 18
 We hold, therefore, that the court below erred in directing the jury to find for the insurance company without hearing its evidence, and that the evidence in the record makes out a case for jury decision. The judgment of the court below is therefore reversed and the case is remanded for another trial in consonance with this opinion.
 
 
 19
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 The court below having directed a verdict in favor of the defendant insurer at the close of the insured's evidence
 
 
 [2]
 The insured was R. B. Springer, who operated a U-Drive-It Company. He died a short time after the accident here involved which occurred Jan. 10, 1950, and Mrs. Florence A. Springer, his widow and administratrix of his estate, brought this action. The term "insured" will be used throughout this opinion to designate either or both of the Springers as the context discloses
 
 
 [3]
 The answer, incidentally, demanded "a jury trial of the issues involved herein."
 
 
 [4]
 Following a pretrial conference which is not reported in the record, the following statements were made by the attorney for insurer and the court:
 "Mr. Smith:
 "If Your Honor please, before we start with the evidence, is it Your Honor's ruling that the only issue in the case will relate to the defense of contributory negligence in the Morris case?
 "The Court:
 "I may permit other evidence to go in for the sake of the record. I may come to that conclusion.
 "Mr. Smith:
 "Of course we will object to the introduction of any evidence germane to any point except that one issue."
 A little later in the trial the attorney for the insurer stated to the court:
 "Mr. Smith:
 "* * * I might state to the Court that we are objecting to these others, and all of these in view of Your Honor's ruling about contributory negligence being the only issue. I have no objection to them on the issue of settlement negotiations.
 "The Court:
 "It may bear upon that phase. They will either show good faith or bad faith, as the case may be."
 At a later stage in the proceedings the court sustained an objection to negotiations carried on between the insured and the injured lady's sister on the ground that such negotiation would be immaterial.
 
 
 [5]
 Insured's counsel admitted in the record:
 "I will concede any date you want as to demand, and state further it was continual from the outset up to the present moment."
 
 
 [6]
 The court's statement in granting the motion for directed verdict reads in part as follows:
 "I see nothing in this case at the moment that would permit me to do other than to direct a verdict, for this particular reason. All the attorneys in this case, including the plaintiff's own attorney, felt that it was the most difficult case to establish any liability. Now can it be said that a man is acting in bad faith when he says to himself, they cannot establish liability with all the legal advice he has got, including the plaintiff's own attorney's opinion that it was very difficult? * * * You cannot say a man is acting in bad faith because he acts upon judgment which is shared by all who are in a position to advise him, can you?"
 
 
 [7]
 He had started in the case representing the insurer of Knowles' employer, and the state court had directed a verdict in favor of his client. Thereupon he was engaged to take a leading part in behalf of all of the defendants in that case, including insurer and insured. The court below here permitted appellee, insurer, to use this lawyer witness as its own witness out of turn
 
 
 [8]
 Springer v. Morris, 1954, Fla., 74 So.2d 781
 
 
 [9]
 It is helpful at this point to quote part of the opinion of the Florida Supreme Court (74 So.2d 785-786) describing the extent of Mrs. Morris' injuries:
 "According to evidence that the jury had the right to believe, the plaintiff's injuries were, in summary, a severe cerebral concussion, fractured pelvis, compound fracture of the right leg, severe comminuted fracture of the left leg, a bladder injury, injured shoulder, and other lacerations and contusions over her body * * *.
 "The medical testimony is that plaintiff's permanent disability is such that she should never work again at her former occupation as waitress, or engage in any demanding physical activities; that she may expect chronic pain or discomfort throughout life; that she would not be discharged as a patient for four or five years; and that future surgery may be required to remove plates from her legs."
 
 
 [10]
 The evidence in the record as to investigation is meager, showing that the insurer did make some investigation, but not disclosing that any statement was ever taken from Mrs. Morris
 
 
 [11]
 This Court has recently had occasion to examine the cases from the Florida courts dealing with contributory negligence in a case where the court below had directed a verdict for the defendant on the ground that no jury question had been developed, Nesbit v. Everette, 5 Cir., 1955, 227 F.2d 157, 161. We epitomized the Florida rule as we conceived it to be in these words: "We are in no doubt that the rule controlling here is the same in Florida as in other states, that `where the evidence is in conflict or where reasonable minds might differ as to the conclusions and appropriate inferences to be drawn therefrom, the problem of resolving the doubts and conflicts is the responsibility of the jury' and that it was error to instruct a verdict in this case."
 In Townsend Sash Door & Lumber Co. v. Silas, 1955, 82 So.2d 158, 159, the Supreme Court of Florida held contributory negligence to be an affirmative defense as to which the defendant carried the burden of proof. See also from the Florida Court Ward v. City Fuel Oil Co., 1941, 147 Fla. 320, 2 So.2d 586; Hart v. Held, 1941, 149 Fla. 33, 5 So.2d 878; Kidd v. Cox, Fla.1949, 40 So.2d 454; King v. Griner, Fla.1952, 60 So.2d 177; and Cadore v. Karp, Fla.1957, 91 So.2d 806.
 
 
 [12]
 Pertinent language of the letter is this:
 "Plaintiff will settle her claim for her case against the defendant Florence A. Springer, etc. for $5,000.00 at this time. This is an offer of settlement only to the defendant, Florence A. Springer, and only for the purpose of releasing defendant, Florence A. Springer, from further liability under this suit."
 
 
 [13]
 The letter reads in part as follows:
 "* * * we notified the insurance company that we knew settlement could have been made for less than the policy limits. Now that an offer of settlement has been made within the policy limits, we again state the Springer estate will hold the insurance company responsible, should any judgment be obtained against the administratrix for an amount above the policy limits."
 
 
 [14]
 Pertinent portions of the letter are as follows:
 "Before the company can consider the feasibility or justification for disposing of this litigation as to the Springer estate alone, the right of the defendant, Paul R. Knowles, the driver of your defendant's automobile, must be taken into consideration.
 "The policy which covered the automobile in the accident, gave to the operator rights as an additional insured. Such rights cover him to the limit of the policy coequally with Springer Motor Company, and in addition required the company to give him a defense of the law suit, if called upon to do so. Hence the company is not in a position legally or ethically to consider the proposition made by the attorneys for the plaintiff and urged by you. If that were done, the rights of the operator of the automobile, as stated above, would still be outstanding. As soon as you can advise me that you have obtained the consent of the operator, the additional insured under the policy, to the procedure suggested by you, I will then be pleased to submit the file for review to the chief claims examiner of the company for consideration of your suggestion." [Emphasis added.]
 
 
 [15]
 The following terms of the policy relate to this limitation:
 "The limit of bodily injury liability stated in the declarations as applicable to `each person' is the limit of the company's liability for all damages * * * arising out of bodily injury, sickness or disease, including death at any time resulting therefrom sustained by one person in any one accident; * * *
 "The inclusion herein of more than one insured shall not operate to increase the limits of the company's liability."
 
 
 [16]
 This report contained this language: "Our vehicle was traveling * * * one car width to the right of the center line and that he laid down sixteen feet of skidmarks in a west to south course and then traveled approximately thirty-seven feet continuing the west to south course across the white line to the wrong side of the road and the car came to a stop approximately two feet over the center line on the wrong side of the street. The police diagram indicated that our insured skidded sixteen feet to the point of impact and then thirty-seven feet with no skidmarks and then again sixteen feet of skidmarks making a total of sixty-nine feet. * * *It is our opinion that our driver became rattled and, in a sense, lost control of the vehicle entirely." [Emphasis supplied.]
 
 
 [17]
 Auto Mutual Indemnity Co. v. Shaw, 1938, 134 Fla. 815, 184 So. 852, 858: "In addition to this a further duty plainly devolves on the insurer. After it has made an investigation of the accident and the injury, and faces the probability that a recovery will exceed indemnity, it plainly becomes the duty of the insurer to indicate such fact to the insured, to the end that he may take such steps as may be open to him for his own protection. * * The company owes this duty to the insured because it has taken over all of the rights which formerly belonged to the insured, which could be exercised by him to place him in possession of the facts suggesting the possibility or probability of a recovery beyond the limit of the indemnity. Because the contract takes away these rights from the insured and transfers them to the insurer, the insurer owes to the insured the implied duty to so exercise them as to discover the possible extent of the liability and to communicate such fact to the insured."
 This case stands as authority for many of the principles here asserted and quotes copiously from our decision in American Mutual Liability Insurance Company of Boston, Mass. v. Cooper, infra.
 
 
 [18]
 It being the insurer's duty to weigh the probabilities of the case "in a fair and honest way." Auto Mutual Ind. Co. v. Shaw, supra
 
 
 [19]
 We quote some of the pertinent language of that decision, 61 F.2d at pages 447-448:
 "It is well settled in cases of limited liability insurance that the insurer may so conduct itself as to be liable for the entire judgment recovered against the insured, although their judgment exceeds the amount of liability named in the policy. * * * [T]he prevailing rule seems to be that the insurer must act in good faith toward the insured. * * *
 "In our opinion, the insurer cannot escape liability by acting upon what it considers to be for its own interest alone, but it must also appear that it acted in good faith and dealt fairly with the insured. The insurer, as it had a right to do under the policy, assumed exclusive control of the claim against the insured, and took unto itself the power to determine for the insured all questions of liability, settlement of defense and management before and during the trial, and of appeal after final judgment. We are of opinion that this relationship imposes upon the insurer the duty, not under the terms of the contract strictly speaking, but because of and flowing from it, to act honestly and in good faith toward the insured. It was open to the jury to find that the insurer did not perform this duty. * * * During the trial it offered to settle for $3,500, thus apparently admitting the liability of the insured for substantial damages; * * *. It finally rejected a reasonable offer of settlement within that limit because the insured would not assume a part of its contractual liability. The jury were therefore warranted in finding that the insurer did not act in good faith toward the insured in considering Mrs. Auman's claim for damages, in refusing to settle, and in demanding that the insured contribute to the settlement which it could and should have made at its own expense."