E. W. HENKE, administrator of estate of Richard Allen Town-
send, deceased, appellee, v. IOWA HOME MUTUAL CASUALTY
COMPANY, appellant.

No. 49722.

(Reported in 97 N.W.2d 168)

1124

JUNE 9, 1959.

REHEARING DENIED JULY 24, 1959.

Larson & Carr, of Charles City, for appellant.

Keith S. Noah, of Charles City, for appellee.

PETERSON, J.—June 19, 1955, at about 1:15 a.m., Richard Allen Townsend was driving his car west toward Clarksville, in Butler County, on a gravel road. He had Mr. and Mrs. W. Paul Hess with him in the front seat. Two young girls, Mary Kelm and Betty Johnson, were in the back seat. There is substantial evidence he was driving from 85 to 95 miles an hour. There was some evidence, although not conclusive, he was racing with another car. There was heavy dust and fog, and he did not see a slight curve in the road. He kept driving straight ahead, running into the grass at the side of the road, and then into a ditch. He suddenly put on his brakes, slid 213 feet, and wrecked his car by running into a concrete culvert. Mr. Townsend and Mr. Hess were killed, Mrs. Hess was very seriously and permanently injured. The two girls in the back seat were seriously injured. E. W. Henke was appointed administrator of Mr. Townsend's estate, and Harry Eliason of the estate of Mr. Hess. Mrs. Hess sued the Townsend estate for $37,000; Mr. Eliason, administrator, for $30,827.80; and the two girls, in a joint suit, for $6683.85.

Mr. Townsend had a liability policy with defendant for $5000 for one person, and $10,000 for one accident. There were many negotiations by Mr. Henke, administrator, with defendant and its attorneys for settlement of all cases. Finally, before trial, all plaintiffs offered to settle for $8000. LeMars Mutual Insurance Company, insurer for Larry Lodge, who was accused of racing with Townsend, offered to pay $500, leaving a net figure of $7500, for which defendant could have settled all cases. Defendant refused.

Mrs. Hess's case was tried first, resulting in a verdict of $25,000. Defendant paid $5000, leaving $20,000 unpaid judgment against Townsend estate. Negotiations were again entered

into for settlement of case of Mr. Hess's estate and the two girls. They offered to accept $4800, or $200 under remaining policy limit. Defendant refused. The Hess estate case was tried, resulting in a verdict of $16,447.30. Defendant paid $5000, leaving a judgment of $11,447.30 against the Townsend estate. The case of the two girls has not yet been tried. Defendant never appealed as to either verdict.

Plaintiff sued defendant for the unpaid balance of the two judgments, plus an expenditure of $507.50, made by the Townsend estate in connection with defending the two cases, or a total of $31,954.80. Plaintiff alleges bad faith on the part of defendant in failing to settle all cases, when it could have been done substantially below policy limit. Jury was waived and the case tried at law to the court. Judgment was rendered for the full amount. Defendant has appealed.

Appellant raised nine assignments of errors. They can be consolidated and considered under four general statements: 1. The court erred in admitting as evidence, an interoffice memo from the office of defendant. 2. The court erred in admitting the transcripts of the testimony taken at the two trials. 3. The court erred in its findings of facts in that the facts did not show sufficient bad faith so that the case should be submitted to a jury (in this case, to the court as the trier of the facts). 4. The court erred in rendering judgment for $31,954.80, whereas if bad faith was proven it should have been rendered for either $832.45, or $1500.

One of the earliest cases involving the question at issue in this case was an Iowa decision. Getchell & Martin Lbr. Mfg. Co. v. Employers Liability Assur. Corp., 1902, 117 Iowa 180, 90 N.W. 616, 62 L. R. A. 617. It is not of value as a precedent, as the final decision veered off on a side issue. As a historical matter involving the subject at hand it is worthy of brief consideration.

Defendant had issued a liability policy insuring plaintiff as against claims of employees, not exceeding $1500 in any one case. An employee, Newbury, secured a judgment for $4300. Defendant proceeded to appeal, but its attorneys failed to perfect appeal, and the appeal was dismissed on motion. Employer sued liability company for this negligence. This court

held there was no liability, as there was no assurance there would have been a reversal. There was a presumption of the correctness of the judgment at nisi prius, and no evidence was available to overcome this presumption.

Appellant cites this case in support of its contention as to measure of damages. Since the case was decided on the narrow question above outlined, it is not relevant to the damage question. We will consider the assignment of error as to damages in Division IV.

In the last two decades a new body of law has arisen. The question has been litigated where the insurer could have settled for policy limits or less, and yet verdicts were rendered against the insured in excess of such limits in over two hundred decisions in Federal and State Courts.

Inflationary economic conditions and the tremendous increase in the number of automobile accidents have quickly and greatly increased the number of cases, and size of verdicts. In this new era the case at bar is a case of first impression on the subject in this court. The bases of the cases are the reciprocal obligations placed upon the parties under the liability contract or policy.

In the case at bar, defendant, for a stipulated consideration, among other provisions, agreed: "To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the ownership, maintenance or use of the automobile. * * * Defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient."

Insured, among other provisions, agreed: "The insured shall cooperate with the company and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits. The insured

shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of accident."

A brief statement describes the broad outlines of the question involved. If an insurer acts in complete good faith as to all investigation and negotiations concerning the catastrophe involved it is not liable for excess judgments above policy limits. If negligent, as held in some cases, or if it acts in bad faith, as is now the majority rule, the trial court is obligated to submit to the jury the question of recovery for the excess.

The variations as to facts as to both of these situations are almost as numerous as the decisions rendered. We cannot, therefore, establish a hard and fast rule under this decision for all Iowa cases in the future. We will decide this case, under its facts, and discuss some factors involved, which have been established through reoccurrence and reaffirmance in the State and Federal cases.

To list all cases considering the subject would be superfluous. We will list a few fairly recent cases, together with some helpful articles in which the question has been discussed. 40 A. L. R.2d, the annotation on pages 168 to 226; Iowa Law Review, Volume 43, No. 4, page 588 (1958); Drake Law Review, Volume 7, No. 2, page 23 (1958); following articles in the Insurance Law Journal: No. 278, March 1946, page 130; No. 333, October 1950, page 734; No. 391, August 1955, page 525; No. 415, August 1957, page 483; No. 421, February 1958, page 77; No. 425, June 1958, page 404; Ballard v. Citizens Cas. Co., 1952, 7 Cir., Ill., 196 F.2d 96; Royal Transit, Inc. v. Central Surety & Insurance Corp., 7 Cir., Wis., 168 F.2d 345; Olympia Fields Country Club v. Bankers Indemnity Ins. Co., 325 Ill. App. 649, 60 N.E.2d 896; Hilker v. Western Automobile Ins. Co., 204 Wis. 1, 231 N.W. 257, 235 N.W. 413; Springer v. Citizens Casualty Co., 1957, 5 Cir., Fla., 246 F.2d 123; Southern Fire & Cas. Co. v. Norris, 1952, 35 Tenn. App. 657, 250 S.W.2d 785.

A brief statement of some factors involved, and cases establishing *good faith*, is advisable.

Bad faith requires more than a showing of inadvertence or honest mistake of judgment. Berk v. Milwaukee Auto-

mobile Ins. Co., 245 Wis. 597, 15 N.W.2d 834; Georgia Casualty Co. v. Mann, 242 Ky. 447, 46 S.W.2d 777; City of Wakefield v. Globe Indemnity Co., 246 Mich. 645, 225 N.W. 643; Norwood v. Travelers Ins. Co., 204 Minn. 595, 284 N.W. 785, 131 A. L. R. 1496; Henry v. Nationwide Ins. Co., 139 F. Supp. 806; American Casualty Co. v. Howard, 4 Cir., S. C., 187 F.2d 322.

Where there is no clear and definite evidence that the claim could be settled within the policy limits or for a reasonable figure, or the proposal of the claimant was merely conditional, the insurer cannot be held liable for refusal to settle within the policy limits. Jones v. Highway Insurance Underwriters, Tex. Civ. App., 253 S.W.2d 1018.

■ If the insurer has exercised good faith in its dealings with the insured and if the settlement proposal has been fully and fairly considered and decided against, based upon an honest belief that the action could be defeated or the judgment held within the policy limits, and in which respect local counsel have honestly expressed their conclusion, the insurer cannot be held liable even though there is a mistake of judgment in arriving at its conclusion. Christian v. Preferred Accident Ins. Co., 89 F. Supp. 888; Burnham v. Commercial Casualty Ins. Co., 10 Wash.2d 624, 117 P.2d 644; Hoyt v. Factory Mutual Liability Ins. Co., 120 Conn. 156, 179 A. 842.

Brief statements as to factors held to be *bad faith* will be helpful in connection with case at bar, and for the future.

■ Under policy provisions the insurer controls the litigation. It has been regarded, therefore, that the insurer must give equal consideration to the interests of the insured as it does its own interests, and the failure to do so can be one element of bad faith. Rejecting settlement proposals which the insurer knew to be reasonable, and which were within the policy limits, manifests bad faith towards the insured's interest. Southern Fire & Casualty Co. v. Norris, 35 Tenn. App. 657, 250 S.W.2d 785; Johnson v. Hardware Mutual Casualty Co., 109 Vt. 481, 1 A.2d 817; National Mutual Casualty Co. v. Britt, 203 Okla. 175, 200 P.2d 407, 218 P.2d 1039; Spang Baking Co. v. Trinity Universal Ins. Co., 45 Ohio L. Abs. 577, 68 N.E.2d 122; United States Fidelity & Guar. Co. v. Canale, 6 Cir., Tenn., 257 F.2d 138; Roberts v. American Fire & Cas. Co., 89 F. Supp. 827.

Circumstances have been considered in some cases to be indicative of bad faith when the insurer advised the insured to transfer his property to avoid payment of possible excess liability. Maryland Casualty Co. v. Cook-O'Brien Construction Co., 8 Cir., Mo., 69 F.2d 462; Noshey v. American Automobile Ins. Co., 6 Cir., Tenn., 68 F.2d 808.

Several cases have held that the insurer has been guilty of bad faith by disregarding recommendations urged by their field adjuster as well as by local and trial counsel. This is one element in the instant case. Maryland Casualty Co. v. Cook-O'Brien Construction Co., Royal Transit, Inc. v. Central Surety & Insurance Corp., 168 F.2d 345, Johnson v. Hardware Mutual Casualty Co., and Olympia Fields Country Club v. Bankers Indemnity Ins. Co., 325 Ill. App. 649, 60 N.E.2d 896, all supra; Tully v. Travelers Ins. Co., 118 F. Supp. 568.

■ The insurer must exercise the utmost care and diligence in investigating the case, including the interviewing of witnesses and otherwise ascertaining all facts and circumstances, including visiting the scene of the accident. Failure to do so will be held negligence and will have an influence on the issue of bad faith. Ballard v. Citizens Casualty Co., supra, 196 F.2d 96; Tyger River Pine Co. v. Maryland Casualty Co., 170 S. C. 286, 170 S.E. 346; Southern Fire & Casualty Co. v. Norris, supra.

■ The insurer must not refuse to make a settlement, if it knows that it has no more than an equal, or less than 50-50, chance of winning the case and if the case is lost the verdict against insured will without doubt exceed the policy limits, provided settlement can be made within policy limits. In this respect, there is a shifting degree of care commensurate with the hazard to the insured's interest. National Mutual Casualty Co. v. Britt, supra; Attleboro Mfg. Co. v. Frankfort Marine, Accident & Plate Glass Ins. Co., 1 Cir., Mass., 240 F. 573.

An insurer must necessarily develop sufficient information to arrive at an intelligent evaluation of the claim. Attempting to arrive at such a conclusion without adequate investigation, both factual and medico-legal, may be influential on the bad faith issue. Hilker v. Western Automobile Ins. Co., supra.

■ Failure on the part of the insurer and counsel to inform the insured of his possible excess liability or to disclose to him

the status of settlement negotiations and offers of settlement may be indicative of bad faith. American Casualty Co. v. Glorfield, 216 F.2d 250; 8 "Fire and Casualty Cases" 488 (CA-9, 1954); Waters v. American Casualty Co., 261 Ala. 252, 73 So.2d 524.

When there is clear liability on the part of the insured, it may be evidence of bad faith if an earnest and prompt attempt is not made to settle the case for its reasonable value, depending upon the nature and extent of the injuries. Spang Baking Co. v. Trinity Universal Ins. Co. and National Mutual Casualty Co. v. Britt, both supra.

Above observations are in part quoted and cited from Insurance Law Journal, No. 415, August 1957; Drake Law Review; and Iowa Law Review, all supra.

■ This case is not triable de novo. It is an action at law. We are considering the case on the basis of assignment of errors. If we find the facts are sufficient to justify submission to a jury (in this case the trial court) we are bound by the decision as to findings of fact of the court. R. C. P. 334; Hull-Dobbs Motor Co. v. Associates Discount Corp., 241 Iowa 1365, 44 N.W.2d 403; Weber v. Hansen, 241 Iowa 904, 43 N.W.2d 766; Augusta v. Jensen, 241 Iowa 697, 42 N.W.2d 383; Erickson v. Erickson, 250 Iowa 491, 94 N.W.2d 728.

■ I. Because of the provisions of Iowa Rule of Civil Procedure 141(a) appellant contends it was error to admit the interoffice memo made by Mr. Grimm, Iowa Claim Manager, to A. L. Passage who was defendant's General Supervisor of all claims.

The interoffice memo was as follows:

"To: A. L. Passage
FROM: Dale Grimm
SUBJECT: 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 Richard Townsend    Date Feb. 29, 1956
"I called Don Burington, our Attorney on this case, relative to obtaining a copy of the motion to grant separate trials which was filed by LeMars Mutual Insurance Company, and was advised that as this motion was filed by LeMars Mutual that he did not have a copy of same in his file. He further stated

that he would contact the plaintiffs' attorney in an effort to obtain copy of the motion and would forward same if he was able to get it.

"Attorney Burington was further of the opinion that rather than to pay on our limits on the case of Mrs. Hess which has already been tried that we should try to get the remaining cases packaged up and make one payment in settlement of all. He felt that by going ahead and trying these cases that we were just throwing good money after bad besides involving further attorney fees. He was of the opinion that the physical facts alone would be enough to defeat us in any of the other pending actions. The fact that our car laid down skid marks some 213 feet before striking the cement culvert.

"Attorney Burington asked that I give this information to you and requested that upon your return, after you had time to consider the file, for you to give him a call to discuss this matter further.

"Dale Grimm

Iowa Claim Manager"

(Memo by Mr. Passage in his handwriting on bottom of above statement)

"Our Atty re paying limits of 10,000.00 to settle all cases.

"I told him No! to try the other cases as we are only gambling with 5000.00

"/s/ ALP"

The pertinent parts of rule 141(a) are as follows: "The deponent shall not be required and the court shall not order a deponent or party to produce or submit for inspection any writing obtained or prepared by the adverse party, his attorney, surety, indemnitor or agent, in anticipation of litigation or preparation for trial unless satisfied that the denial of production or inspection will result in an injustice or undue hardship; nor shall the deponent be required or the court order a deponent or party to produce or submit for inspection any part of a writing which reflects an attorney's mental impressions, con-

clusions, opinions or legal theories, or, except as provided in rule 133, the conclusions of an expert."

The trial court admitted and considered this memo in its findings of fact. We do not agree the trial court erred in admitting this memo. It was within the discretion of the court to consider that under all other facts of the case an injustice would arise by denial of admission.

As to the last part of the rule concerning an attorney's mental impressions, conclusions, opinions or legal theories, the contention of appellant is that the statement of Mr. Passage would come under this category. Counsel does not argue or object seriously to the quoted statements of Mr. Burington, the local attorney for defendant. With reference to the memoranda of Mr. Passage appearing at the bottom of the exhibit, this is more in the nature of a statement of fact than an opinion. Appellant's counsel contends Mr. Passage was an attorney in fact for defendant and, therefore, came under the prohibition. We do not agree the intention of the rule is that the conclusions and opinions pertain to any other person than an attorney at law. On either theory the trial court did not commit error in admitting this office memo.

We have considered R.C.P. 141(a) in Henke v. Iowa Home Mutual Casualty Co., 249 Iowa 614, 87 N.W.2d 920. Questions involved are not identical, but we expressed some helpful theories in the case.

■ II. Appellant contends the court erred in admitting transcripts of the evidence in the two cases. There were two periods of negotiation as to settlement. First, before any cases were tried, as to settlement of all cases, and second, after one case had been tried, as to settlement of the remaining cases.

Appellant is correct in contending that as to settlement of all cases, bad faith must rest upon evaluation of all facts, in connection with legal principles, prior to the trial of any case. The same is true as to settlement of remaining cases, but the transcript of the evidence in the first case can be added to defendant's former knowledge as to facts, if there were any changes or additions. The trial court emphasized the transcripts too much, prior to first trial, but it was without prejudice, as hereinafter explained. We do not agree that admission of

the transcripts in the two cases is reversible error. The court had some discretion to see if there were any material differences between the facts known by defendant before trials, and evidence adduced at trials. As to the second negotiations, the court could do something about it if there were added facts; as to the first, nothing. However, the most important reason, as to no prejudice in the admission of the transcripts, is that there were no material differences between the facts known by defendant before the trials, and facts shown in the evidence at the trials. What the trial court said about the transcripts was as effective without them as with them.

Mr. Henke testified as follows: "I was present at both trials of the Irene Hess and Eliason cases and had conferences with Mr. Burington and Mr. Bovard during the trial. There was no surprise evidence introduced in either trial and the facts were substantially the same as were known to Mr. Bovard, Mr. Burington and myself prior to the trial."

No evidence appears in the record in contradiction of this statement.

III. Appellant contends there was not sufficient evidence of bad faith to justify submission to jury (or as in this case, to the Judge) on decision as to facts.

This is a guest case, so in accordance with section 321.494 plaintiffs must prove reckless driving. It is necessary to amplify the facts beyond those already stated. The parties had all been attending a dance. According to the testimony of the sheriff, who had been at the dance, and arrived at the scene of the accident within a few moments, Townsend was not intoxicated. The dust and fog were so heavy that a driver could not see more than 20 or 25 feet ahead of his car. The skidding for about 213 feet, striking the concrete culvert, killing two occupants, almost fatally injuring another, and seriously injuring the two girls were all shown by the coroner's inquest and defendant's investigation before any trials. It is important that defendant is cognizant of all facts before the trial, to properly charge bad faith.

Complete investigation was made on behalf of defendant by one of the ablest and experienced law firms in northern Iowa. The only witnesses not interrogated by the investigator were

three boys who were on the scene of the accident part of the time. However, Mr. Henke talked with the boys and gave the attorney for defendant the result of his inquiry. There was one matter which was contradictory, but defendant had the full benefit of all contradictory statements prior to trial. A statement of the two girls in the back seat was taken by the investigator and a court reporter at the hospital three days after the accident. Afterwards the two girls sued the estate and it became evident that the allegations in their suit were at variance with their previous statements. Defendant's attorneys then filed interrogatories in the girls' case questioning them again concerning their version of the accident. These interrogatories disclosed that the girls were going to testify to excessive speed. Defendant had full knowledge of the fact that such testimony would be given by the two girls, prior to the trial of the cases.

There are four elements of bad faith listed by the trial court in its findings of fact and conclusions of law.

1. Defendant was guilty of bad faith in failing to avail itself of the opportunities to settle all of the cases when the evidence of liability on the part of its insured, Richard Townsend, was overwhelming, and the evidence as to damages indicated clearly that recoveries would exceed the low limits of the policy.

An evaluation of the facts of the case and a careful briefing of the decisions of this court as to the guest statute could not help but indicate to reasonably minded people, and efficient attorneys, that the cases were such that they would be submitted to a jury.

There have been several decisions of this court where we have held the automobile driver guilty of reckless driving which are somewhat similar to the Townsend cases. We will only cite two. They were guest cases, and we held reckless driving. Whiting v. Stephas, 247 Iowa 473, 74 N.W.2d 228; Skalla v. Daeges, 234 Iowa 1260, 15 N.W.2d 638.

There is a similarity with Whiting v. Stephas, supra, in that the driver did not follow a curve in the road, but drove straight ahead and hit the bridge railing. In the case at bar Townsend failed to follow a curve in the road, drove into the ditch and after skidding over 200 feet struck a culvert abut-

ment. In Skalla v. Daeges, supra, the driver was driving on a concrete highway in Shelby County. He was going from 90 to 100 miles per hour. The catastrophe which happened was that he struck a bridge abutment, the same as in the case at bar.

In view of all these conditions we agree with the trial court that when all cases could be settled for 25% less than their policy limit, defendant acted in bad faith in its relationship with the insured.

2. Defendant was guilty of bad faith when it failed to accept and heed the recommendations of its own attorneys to settle the cases. Maryland Casualty Co. v. Cook-O'Brien Construction Co., Royal Transit, Inc. v. Central Surety & Insurance Corp., Johnson v. Hardware Mutual Casualty Co., and Olympia Fields Country Club v. Bankers Indemnity Ins. Co., all supra.

Prior to the trial of the first case, attorneys for defendant, attorneys for plaintiffs in the damage cases, and the administrator of Mr. Townsend's estate, who is also an attorney, entered into extended negotiations looking toward settlement. At the request of Mr. Burington, attorney for defendant, Mr. Henke, the administrator of the Townsend estate, contacted plaintiffs' attorneys in the damage cases and secured the best proposition of settlement which he could get. As to this question Mr. Henke testified:

"Exhibit 'N' is a letter from Mr. Smith [attorney for claimants] to myself dated December 7, 1955, in which he sets forth the offer of compromise settlement in these three cases— $4750 for the Paul Hess Estate case; $3000 for the Irene Hess case; $600 for Mary Kelm and $400 for Betty Johnson—a total of $8750. I relayed this information to Mr. Burington and the company."

In a letter from Mr. Henke to defendant dated December 9, 1955, in which he conveyed the above offer of settlement, he also alerted defendant as to excess liability as follows:

"In the Estate of Richard Allen Townsend, deceased, after the payment of all debts and expenses I will have approximately $1500 for distribution. It is my duty to preserve these assets for the mother and father of said decedent, who are the sole heirs. In view of these circumstances, as Administrator of the

Estate of Richard Allen Townsend, deceased, I hereby submit the above offer of settlement and insist that settlement on this basis be made by your Company. In the event that you do not see fit to settle and compromise these cases, and if the above entitled matters are tried and any verdict is returned in excess of the liability limits of your policy, I will look to your Company to save this Estate harmless from the payment of such excess."

As to further negotiations concerning settlement Mr. Henke testified:

"I did not talk to Mr. Burington from the time of this letter of December 9th until shortly before the trial of the case. * * * it was my understanding that Mr. Burington had gone to Des Moines in an effort to get the Company to settle these cases and that a lower settlement offer of $8000 had been acceptable to the plaintiffs. Mr. Burington had gone to Des Moines to effect that settlement through his Company and he had been unsuccessful in getting the Company to settle. He told me that he had talked with the Claims Manager, Mr. Passage, and the President of the Company, Mr. Thomas, and I believe, in his exact words, he indicated, he pounded the table to try to get them to settle these cases and they refused to do so."

Mr. James Smith, attorney for claimants, testified concerning settlement negotations as follows:

"* * * The figure of the settlement was $8750 for all three cases. After that letter, I had a conference with Mr. Burington on January 9, 1956, here in the courtroom. Mr. Burington and I and Mr. Bovard [a legal associate in Burington firm] went into the library back here and Mr. Burington's first statement to me was—'Jim, tell me about the injuries to Irene Hess', which I did. Then he said—'Jim, would your people take eight thousand for the package?' I told him I would have to contact them—and we left shortly after that. Mr. Bovard took no part in the conversation. Mr. Burington's remark was that, 'This is a case that should be settled.' He said, 'I am afraid you will have more trouble with your people than I will with mine.' He said, 'Jim, if you would take $8000, we might get this settled,' and that he would go down and see his people in Des Moines.

"My people agreed to the $8000 settlement and I called Mr.

Burington and told him that $8000 would go. I got a call from him (Burington) the night of the thirteenth of January, by telephone, and he said he had been to Des Moines and put it up to the representatives down there and he said, 'Not only did I talk to the claims men but I even went in and talked to the president,' and he said, 'Jim, I spent a lot of time there, and I laid it right on the table but they won't go above $5000 and they want some from the LeMars Mutual,' and he said, 'If I can get $3000 out of Ed (E. P. Donohue, New Hampton), we can get the job done still.' * * * He informed me we couldn't make the settlement—that Ed's Company wouldn't come on with the $3000 and, therefore, we couldn't arrive at a common figure of $8000."

In his testimony in the case Mr. Burington told about his visit to the office of the company and the conversations he had with Mr. Passage and Mr. Thomas, the president of the company, in a general way. He did not deny the statements made by Mr. Henke and Mr. Smith as to having urged defendant to settle.

March 26, 1956, after the first case had been tried and verdict rendered for $25,000, negotiations were entered into for settlement of the cases as to the three other passengers. On said date Mr. E. W. Henke, administrator of the Townsend estate, wrote defendant, again alerting them as to the danger which was confronting the estate on the last three cases, as to excessive liability above remaining policy limit of $5000:

"* * * I recently transmitted another offer of settlement for the Kelm case [the two girls in one case] and the Eliason case through your attorneys for the sum of $4800 total, which also is within the liability limits of your policy. It is my best judgment that any verdict in the Eliason case will again exceed the liability limits of your policy. All things being taken into consideration it is readily apparent that your company has acted in bad faith in failing to effect settlement in these cases, and under no circumstances have they taken into consideration the duty and obligation that it has to the insured. I must again insist that the offer of settlement in the Kelm case for $1000, and the offer of settlement in the Eliason case for $3800 be accepted by your company and the necessary releases procured in order that this estate may be protected."

3. There was an element of bad faith on the part of defendant in insisting that LeMars Mutual Insurance Company pay $3000 on the basis of an $8000 settlement for all cases.

After the commencement of the actions plaintiffs filed amended and substituted petitions and included Larry Lodge and his father, owner of the car he was driving, as party defendants. The claim of plaintiffs was that he had been racing with the Townsend car. Motions were filed on behalf of Lodge and son for separation of the cases as to trial. These motions were sustained.

While there was some evidence to the effect of racing it was not too definite. The two girls in the back seat both stated in answer to interrogatories in their case, that there was racing with Larry Lodge. At the coroner's inquest Larry testified as follows:

"Q. Would you say he was attempting to race with you when he passed you? A. I don't know. He might have been. There was so much dust.

"Q. Did he give you any signal when he passed you? A. No."

The primary responsibility was on the estate of Townsend. Defendant was his insurer. He was the one who was guilty of reckless driving and whose car caused the death and injuries.

Any responsibility on Lodge was uncertain and incidental. It was an unreasonable request on the part of defendant to ask that the insurer of Lodge pay almost one half of the cost of settlement of all cases. LeMars Mutual Insurance Company offered to pay $500 of the $8000 proposed. Their attorney said he would recommend that they pay $750. As an evaluation of the whole situation this appears like a reasonable offer on the part of LeMars Mutual Insurance Company and defendant was not giving adequate consideration to the interest of the estate of Townsend in demanding the excessive contribution. The demand was sufficient to justify the position of the trial court as to one element of bad faith.

Appellant cites one case in refutation of the court's position. Mendota Electric Co. v. New York Indemnity Co., 1928, 175 Minn. 181, 183, 221 N.W. 61, 62. In this decision, the court said: "Such insistence that another party jointly sued for the

tort make a given contribution is not, *standing alone,* evidence of bad faith." (Emphasis ours.) The implication is that if there were other factors of bad faith it might constitute one element in the decision. We have such other factors in the case at bar.

4. The trial court also made a finding of fact that the record was replete with disregard by defendant for the interest of the insured. This is a rather general statement and in order to be of any value a more specific statement should be made.

It appears without conflict that defendant had complete knowledge as to the seriousness of the claims involved. There was the case for the death of Mr. Hess who was a young man; of his wife who was critically and permanently injured; and of the two girls in the back seat who were somewhat seriously injured. As shown in No. 2 of this division defendant would not heed the advice of its local attorney. The officers of defendant-company, an important and active liability insurance company, knew of the trend of at least the last ten years, of large verdicts against automobile owners in death and serious injury cases. Yet, defendant placed itself back of what it considered an impregnable wall of a five and ten thousand dollar policy limit, and in effect said: "Let the insured, or as in this case the insured's estate, take the consequences." Defendant was willing to "gamble" as to its $10,000, but was indifferent as to the best interest of the insured. The trial court had a basis for its finding as to bad faith in this respect.

IV. Appellant contends the trial court was in error in computing the measure of damages on the basis of $31,954.80. Its counsel argue that the estate of Townsend was only damaged to the extent of $832.45, the amount in the hands of the administrator at this time, or possibly the sum of $1500, which is the amount in his hands prior to the expenditure of several hundred dollars in connection with the defense of the cases against the estate.

We will approach consideration of this contention from two angles.

1. We start from the premise that having established bad faith on the part of defendant the administrator is obligated to account for and pay to the heirs of Townsend, who are his

father and mother, the approximate amount of $1500, the net value of his estate. It is true that this is modest, but the principle is the same whether the estate is large or small. Under these conditions a statement of the situation will demonstrate the utter futility of the claim of defendant, if we were to reduce the judgment and order them to pay into the estate the sum of $1500. Immediately upon payment of said amount the two judgments of over $31,000 now in force and effect against the estate would not only take the $1500 paid in by defendant, but would also take the $832.45 now on hand. This would mean that there would be no assets in the estate for distribution to the heirs. We cannot agree with this theory.

2. There have been discussions in several recent cases as to the question of the amount of damages to which an insured is entitled in case of excessive verdicts above policy limits. There were two rather early decisions which held that before the insured could collect from the insurer he was obligated to pay the judgment. Dumas v. Hartford Accident & Indemnity Co., 1942, 92 N. H. 140, 26 A.2d 361; Universal Automobile Ins. Co. v. Culberson, 1935, 126 Tex. 282, 86 S.W.2d 727, 87 S.W.2d 475. The general holding in these two cases was to the effect that as long as the insured had not paid out anything he was not hurt.

However, the more recent cases and the present overwhelming weight of authority now is that in cases of bad faith the insured can collect even though he has not paid the judgment. Southern Fire & Casualty Co. v. Norris, 1952, 35 Tenn. App. 657, 250 S.W.2d 785; Brown v. Guarantee Insurance Co., 1957, 155 Cal. App.2d 679, 319 P.2d 69; Wessing v. American Indemnity Co., 1955, 127 F. Supp. 775; Farmers Insurance Exchange v. Henderson, 1957, 82 Ariz. 335, 313 P.2d 404. In addition to holding that the insured was entitled to judgment, if it was a case of bad faith, the cases above-cited also contain some valuable general reasoning.

The case of Southern Fire & Casualty Co. v. Norris, supra, is often cited as the leading case on this problem. In this case the insured sued the insurer for the amount of the unpaid excess amount of the judgment against him. The insured was judgment proof. There was a finding of bad faith of the insurer

after which the court held that prepayment of the excess is not a condition precedent to a suit by the insured, for such a rule would be a windfall to the insurer who has been derelict in his actions after taking premiums paid in good faith by the insured. Also, the judgment debt of the insured can only be escaped by payment, or by a discharge in bankruptcy, and the latter would cause the credit of the insured to be impaired. The court went on to say that such a rule might well cause the insurer to be less responsive to the trust duties owing the insured where the insured is insolvent.

Brown v. Guarantee Insurance Co., supra, was a case where the insured was forced to file a bankruptcy petition. The bankruptcy trustee later assigned any and all interests of the insured in any and all claims against the insurer to the plaintiff of the personal injury action. After a finding of bad faith on the part of the insurer the court held that prepayment of the excess amount of the judgment is not a condition precedent to a suit by the insured against the insurer. In support of its holding the court said that the insurer should not be able to use the limited financial ability of the insured to escape its obligations. The court said the judgment sets out the measure of damages and it then cited the Southern Fire case mentioned above.

In Wessing v. American Indemnity Co., supra, suit was brought by the insured against the insurer for the unpaid excess amount of the judgment against him alleging bad faith on the part of the insurer. The insurer filed a motion to dismiss, claiming that prepayment of the excess is a condition precedent to a suit for bad faith. This motion was denied by the court which held that this action sounded in tort. In support of granting the insured the entire amount of the unpaid excess, the court said that the mere existence of the liability of a judgment sufficiently establishes the damage and its measure. The court stated further that there is no difference between expending sums and incurring obligations.

Farmers' Insurance Exchange v. Henderson, supra, was a suit by the insured for the portion of the amount paid the plaintiff by virtue of an execution sale of his business property and for consequential damage, alleging bad faith of the insurer. There was a finding of bad faith. The court in referring to the

question of prepayment said that the better rule is that when the insured has become obligated to pay a judgment wrongfully imposed on him, his cause of action accrues. The insurer cannot require the insured to pay or supersede a judgment wrongfully imposed on him.

Appellant contends that because the insured is dead a different rule applies. If he were alive he might be hounded by his creditors until expiration of statute of limitations. Appellant contends such procedure is not in effect since he has passed away. Under the case of Brown v. Guarantee Insurance Co., supra, this theory has no value. Furthermore, there is only one way the administrator can distribute the balance in the Townsend estate to his heirs and that is through full payment of the judgments against the estate.

The judgment of the trial court is affirmed.—Affirmed.

All JUSTICES concur except BLISS, J., who takes no part.